CITY OF BAYONNE, A MUNICIPAL CORPORATION, PETITIONER-RESPONDENT, v. PORT JERSEY CORPORATION AND GLOBAL TERMINAL AND CONTAINER SERVICES, INC., RESPONDENTS-APPELLANTS.

Argued December 11, 1978—Decided March 20, 1979.

*Mr. Kenneth F. Kunzman* argued the cause for appellants (*Messrs. McElroy, Connell, Foley & Geiser,* attorneys; *Mr. Kunzman* of counsel and on the brief).

*Mr. Leo Rosenblum* argued the cause for respondent (*Messrs. Rosenblum* and *Rosenblum,* attorneys; *Mr. Leo Rosenblum* of counsel and on the brief).

*Mr. Peter D. Pizzuto,* Deputy Attorney General, argued the cause for Division of Taxation, *amicus curiae* (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; and *Mr. Pizzuto* on the brief).

The opinion of the court was delivered by

MOUNTAIN, J. The single issue in this case is whether very large construction cranes, mounted and movable on railroad-type tracks, are to be taxed as realty or as personalty.

The City of Bayonne imposed a tax upon three such cranes owned by Port Jersey Corporation and used by Global Terminal and Container Services, Inc. The tax was assessed under *N. J. S. A.* 54:4–1 upon the theory that the cranes were real property and taxable as such by the local taxing district. The Hudson County Board of Taxation disagreed, holding that the cranes were personal property. This result was affirmed by the State Division of Tax Appeals. The Appellate Division reversed, agreeing with the taxing district that the cranes were real property. We granted the taxpayers' petition for certification. 75 *N. J.* 533 (1977).

There is no issue here as to value since counsel stipulated at the hearing in the Division of Tax Appeals that each of

the three cranes was worth $1,000,000. The assessments before us are in respect of the years 1972 and 1973.

The property subject to tax was carefully described in the opinion of the Appellate Division as follows:

The cranes are used in the operation of loading and unloading of ships designed to carry freight in containers. The berthing space for the container ships is 1,800 feet in length and provides accommodations for two or three ships. It is serviced by a 1,800-foot pier which was specially designed and constructed to accommodate the three cranes in question. The deck of the pier consists of 6-inch concrete on piling. Each crane weighs approximately 1,000,000 pounds, and special piles capped with a 10-inch continuous strip of concrete were constructed as the base for the crane rails built into the pier. The rails, similar to those used on a railroad, weigh 175 pounds per foot.

The cranes are huge. Each is approximately 50 feet wide and stands approximately 170 feet above the rail. The lower side of the boom on each crane is approximately 90 feet above the rail, but when it is necessary to accommodate the berthing of a container ship, the boom may be raised to a height of 245 feet above the rail. Each crane is operated by electrical power, and to accommodate this need, an electrical bus bar system has been erected parallel to the length of the pier and immediately joining the rail side of the pier. This system consists of a series of steel columns, fastened to concrete footings. Each is approximately 16 feet high and spaced at intervals of 20 feet. The columns are connected at the top by a supporting steel structure which is cantilevered laterally in the direction of the water for a distance of approximately 4 feet, from which are suspended 4 electrical bus bars running the length of the pier which in turn deliver the electrical power through contact shoes which are directly connected to the cranes.

The bus bar system, an integral part of the cranes, derives its power from two special transformers which are located approximately 150 feet away from the rail side of the pier. Each transformer weighs approximately 14,000 to 15,000 pounds and is embedded on a concrete base about 4 feet high. The transformers are specifically designed to service the cranes. In order to supply power to the transformers and the cranes, an electrical substation is utilized. Forty percent of the substation's output is required to supply the necessary energy to operate the cranes. An additional two-story building set back approximately 75 feet from the rail side of the pier was erected to control the operation of the cranes. These additional facilities were erected specifically to service the cranes at a cost of approximately $815,000.

To this description we add only that the cranes are readily movable. An expert, called by the taxpayers, indicated he had participated in movements of similar equipment from New Jersey to New Orleans and from New Jersey to Houston. The cranes were simply rolled onto barges having similar rails and fastened to the barge.

In concluding that the cranes were real property, the Appellate Division relied heavily upon and quoted extensively from an earlier opinion of that court, *National Lead Co. v. Bor. of Sayreville*, 132 *N. J. Super.* 30 (App. Div. 1975). *National Lead* is very similar to this case. The problem, common to that case and to this, was well stated in the court's opinion in the earlier litigation:

*N. J. S. A.* 54:4–1 *et seq.* provides generally for the taxation by local tax districts of all property real and personal within their boundaries not otherwise exempted or expressly excluded from the operation of the chapter. Provisions for the assessment of real property are contained in *N. J. S. A.* 54:4–23 *et seq.* Prior to 1966 all tangible personal property other than household property and personal effects was also assessed and taxed by the local unit. *N. J. S. A.* 54:4–9 and 91. Since all taxable property, real or personal, was then taxed at the general rate of the district, the category in which machinery and equipment should be placed did not matter.

In 1966 the State preempted the taxation of business personal property by the enactment of *N. J. S. A.* 54:11A–1. As a result, the assessor in each taxing district now has to determine in appropriate cases what is includible as taxable real property, particularly in the case of fixtures which, in certain circumstances, might by annexation be assimilated into the realty. 1 *Thompson, Real Property* (1964), § 55, at 170 *et seq.* [132 *N. J. Super.* at 35]

The Business Personal Property Tax Act, *N. J. S. A.* 54:11A–1 *et seq.*, mentioned in the foregoing quotation, generally imposes a tax at the State level upon all personal property used in business, such property being no longer subject to tax at the local level. It contains the following pertinent definition:

For the purposes of this act, unless the context otherwise requires:

\* \* \* \* \* \* \* \*

(b) 'Personal property used in business' shall mean tangible goods and chattels used or held for use in any business, transaction, activity or occupation conducted for profit, but shall not include:

\* \* \* \* \* \* \* \*

(2) goods and chattels so affixed to real property as to become part thereof and not to be severable or removable without material injury thereto; [*N. J. S. A.* 54:11A–2]

If these cranes come within the exception last above quoted, then they must be taxed as real estate; if they are found not to come within this exception, they are properly taxable as personal property used in business under the Business Personal Property Tax Act.

In *National Lead Co. v. Bor. of Sayreville, supra,* the Appellate Division concluded that certain heavy machinery and equipment, although removable without actual physical injury to the real estate or to the equipment itself, was nevertheless to be treated for tax purposes as realty. In reaching this conclusion, the court placed heavy reliance upon the so-called "institutional doctrine," 132 *N. J. Super.* at 39–40, a rule which has in the past played a significant role in the commercial and property law of this State. In order to make an appropriate disposition of the case before us, we find it necessary to reconsider the institutional doctrine, especially in the light of legislation bearing upon it and with appropriate regard to its history in this State.

To put the problem in focus it is necessary first to recall that the Uniform Conditional Sales Act, *R. S.* 46:32–1 to 33, was the law of this State from its adoption, *L.* 1919, *c.* 210, until its repeal by the Uniform Commercial Code, *L.* 1961, *c.* 120, effective January 1, 1963. *See N. J. S. A.* 12A:10–105, 106. Section 7 of the Uniform Conditional Sales Act, quoted below,[1] contained language, here under-

---

[1] If the goods are so affixed to realty, at the time of a conditional sale or subsequently, as to become a part thereof and not to be severable wholly or in any portion without material injury to the

scored, which is obviously the source of the language appearing in the Business Personal Property Tax Act quoted above. Thus the Legislature, in drafting the more recent tax statute, has chosen to employ the same test to differentiate real from personal property, when the point is not clear, as was used in the former Uniform Conditional Sales Act. In each case the test is whether removal or severance of particular goods or chattels will result in material injury to the realty. This may be referred to as the "material injury" test. Since the Legislature, in drafting the tax act, has chosen this particular language from a prior statute, it behooves us to examine the meaning and interpretation given to the words as used in the earlier enactment as a guide to their significance in the more recent legislation.

Upon undertaking such an examination, we quickly discover that the "material injury" test as applied in this State under the Uniform Conditional Sales Act gave rise to a peculiar and almost unique rule known as the institutional doctrine.

freehold, the reservation of property as to any portion not so severable shall be void after the goods are so affixed, as against any person who has not expressly assented to the reservation. If the goods are so affixed to realty at the time of a conditional sale or subsequently as to become part thereof, but to be severable without material injury to the freehold, the reservation of property shall be void after the goods are so affixed as against subsequent purchasers of the realty for value and without notice of the conditional seller's title, unless the conditional sale contract, or a copy thereof, together with a statement signed by the seller briefly describing the realty and stating that the goods are or are to be affixed thereto, shall be filed before such purchase in the office where a deed of the realty would be recorded to affect such realty. As against the owner of realty the reservation of the property in goods by a conditional seller shall be void when such goods are to be so affixed to the realty as to become part thereof, but to be severable without material injury to the freehold, unless the conditional sale contract, or a copy thereof, together with a statement signed by the seller briefly describing the realty and stating that the goods are to be affixed thereto, shall be filed before they are affixed, in the office where a deed would be recorded to affect such realty. [R. S. 46:32–14; emphasis added]

It will be helpful to examine an illustrative case, which discussed and relied upon this doctrine. In *Smythe Sales Corp. v. Norfolk B. & L. Ass'n,* 116 *N. J. L.* 293 (E. & A. 1936), the issue was whether a conditional vendor could replevy certain oil burner equipment that had been placed in a four-family house having a single heating plant. Shortly after the filing of the conditional sales contract, the conditional vendee — owner of the premises — executed and delivered a mortgage on the property in favor of the defendant building and loan association. The latter acquired record title about a year later by purchase at an execution sale instituted by a judgment creditor. The Court held that the defendant, as subsequent purchaser, prevailed over the conditional vendor, who was denied the right to repossess the oil burner equipment, either by replevin or otherwise. It pointed out that without the heating equipment, the building would be unfit for dwelling purposes, and said:

\* \* \* When a chattel which, clearly, is permanently essential to the completeness of a structure, having regard to the character of that structure and the functioning of it in the use for which ,it was obviously designed, is actually, purposely and lawfully affixed to and into the structure, it becomes, in our opinion, a part of the realty; and if the severance of it will prevent the structure from being used for the purposes for which it was erected or for which it has been adapted, then the article is not severable without material injury to the freehold. By that standard the articles sought by plaintiff are not severable without material injury to the freehold. The willingness on the part of the plaintiff to abandon parts of the equipment does not alter the relationship which the equipment, as a whole, bears to the remaining parts of the structure. In such a situation the degree of affixation is less important than the indispensability of that which is affixed.

[116 *N. J. L.* at 298]

Several features of this decision should be especially noted. The assent to removal in the event of default, given by the landowner-purchaser to the conditional vendor under the terms of the conditional sales contract, was held not binding upon a subsequent purchaser despite the fact that the vendor

had taken all protective steps by way of timely filing available to him under the Uniform Conditional Sales Act. Thus the inquiry as to whether property was severable without material injury to the freehold was to be determined not by a test of physical injury, as the statute seemed to say, but rather by a test of functional or economic injury. This was the institutional doctrine.

It is not necessary for present purposes to refer in any detail to the many cases in New Jersey which applied — and probably misapplied — the doctrine.[2] Suffice it to say that the decisions were in irreconcilable conflict.[3] The doctrine had few, if any, defenders.[4] It seems to have been copied

---

[2]The best — and most amusing — discussion of these cases appears in an article by Professor William H. Farnham prepared for the New York Law Revision Commission. 1942 New York Law Revision Commission Report 10–21.

[3]Professor Grant Gilmore points out that cases invoking the institutional doctrine seem to have disappeared from the New Jersey Reports after 1940, "at a point when it seemed that maximum confusion had been achieved." 2 G. Gilmore, Security Interests in Personal Property, § 28.6, p. 768 (1965).

[4]One unfortunate result produced by the rule was the general inability of owners of apartment houses and other multiple dwellings to finance the purchase of new heating units, refrigerating units or other appliance equipment that, upon installation, might be deemed necessary to the continuing operation of the building as a functional whole. Under the institutional doctrine such equipment would come under the lien of a real estate mortgage on the premises and could not be repossessed without the consent of the real estate mortgagee— which understandably was difficult or impossible to procure. The conditional vendor, or its assignee, would thus end up with what was essentially an unsecured loan, or at best a very junior interest.
The source of the institutional doctrine is far from clear. One authority ascribes its origin to the opinion of Lord Mansfield in Lawton v. Salmon, 1 H. Bl. 259, 126 Eng. Rep. 151 n. (C. P. 1782). 5 American Law of Property, § 19.4, p. 19 & n. 1 (Casner ed. 1952). Professor Gilmore has this to say:
By way of imaginative speculation, it might be suggested that the New Jersey courts were less interested in priorities than they were in the plight of tenants in large apartment houses at a time

from no other jurisdiction, nor to have been ever imitated elsewhere.[5] The draftsmen of the Uniform Commercial Code undertook to abolish the doctrine.

Section 9–313 [of the code[6]] was drafted with anxious care so as to make crystal clear that neither the New Jersey Institutional Doctrine nor the Pennsylvania Plant Mortgage Doctrine was tenable under the Code. [*Gilmore, The Purchase Money Priority,* 76 *Harv. L. Rev.* 1333, 1397–98 (1963)]

When the Article 9 [of the Uniform Commercial Code] treatment of fixture priorities came up for discussion, there seemed to be unanimous agreement (heartily concurred in by lawyers from New Jersey and Pennsylvania) that the deviational New Jersey and Pennsylvania doctrines were wrong and should be rejected. [2 *G. Gilmore, Security Interests in Personal Property, supra,* § 302, p. 804]

It is now abundantly clear that as to security interests in personal property, the former "institutional" test has been abrogated for the purpose of determining whether a prior secured party may remove his collateral upon default. *N. J. S. A.* 12A:9–313(5)[7] leaves no doubt that he may do so.

when the collapse of real estate values had cast an unlovely light on some of the financing methods which unscrupulous operators had made use of during the 1920's. Rather than see a substantial part of the population condemned to camping out on the New Jersey marshes, without heat, light or refrigeration, the courts ordered that the essential equipment be left in the apartment houses. This humanitarian gesture incidentally gave priority to the real estate mortgagee over the purchase-money interest in the equipment. [2 *G. Gilmore, supra,* § 28.6, pp. 768–69]

[5]The only other "deviational" state was Pennsylvania where the Plant Mortgage Doctrine prevailed. This was somewhat like, but by no means identical with, the New Jersey institutional doctrine. 2 *G. Gilmore, supra,* § 28.6, pp. 767–70.

[6]Now *N. J. S. A.* 12A:9–313.

[7](5) When under subsections (2) or (3) and (4) a secured party has priority over the claims of all persons who have interests in the real estate, he may, on default, subject to the provisions of Subchapter 5, remove his collateral from the real estate but he must reimburse any encumbrancer or owner of the real estate who is not the debtor and who has not otherwise agreed for the cost of repair

Material injury is no longer the test. Removal, conditioned upon reimbursing any encumbrancer or an owner who is not the debtor, is now unmistakably available to such a secured party.

■ We return to the tax problem that faces us. As we have seen, the institutional doctrine, at least to the extent indicated above, was rejected by the New Jersey Legislature upon its adoption of the Uniform Commercial Code in 1961.[8] The Business Personal Property Tax Act was not adopted until 1966. It employs, as we have already explained, the "material injury" test to determine whether chattels affixed to real estate are or are not "personal property used in business." We do not think the "material injury" test set forth in the 1966 tax statute should be given the meaning it once had — a meaning that had been rejected five years before the passage of the 1966 act. The Legislature surely did not mean in 1966 to resurrect a doctrine which it had rather carefully interred in 1961. Rather we think it should be given a meaning devoid of any association with the now-rejected institutional doctrine.

The meaning that the phrase "material injury" had been given in the great majority of those states which had adopted the Uniform Conditional Sales Act was a test of irreparable or serious physical damage. "Serious physical damage to the property was interpreted as removal of something essential to its support." 5 *Powell on Real Property*, § 660.2 at 96.15 (1977). "[A]nything could be removed unless the removal, in effect, destroyed the structure." 2 *G. Gilmore, Se-*

---

of any physical injury, but not for any diminution in value of the real estate caused by the absence of the goods removed or by any necessity for replacing them. A person entitled to reimbursement may refuse permission to remove until the secured party gives adequate security for the performance of this obligation. [*N. J. S. A.* 12A:9-313(5)]

[8]"With the enactment of the Code in New Jersey, the 'institutional doctrine' has gone to its final rest." *Gilmore, The Purchase Money Priority, supra,* 76 *Harv. L. Rev.* at 1361, n. 62.

*curity Interests in Personal Property, supra,* § 30.2 at 804.
We conclude, therefore, that the exclusion of

goods and chattels so affixed to real property as to become part
thereof and not to be severable or removable without material in-
jury thereto

appearing in *N. J. S. A.* 54:11A–2 should, looking solely to
the language of the statute, be taken to mean only those chat-
tels the removal of which will do irreparable or serious physi-
cal injury or damage to the freehold.

▇ We find further support for this conclusion in the
legislative history of the Business Personal Property Tax Act
(the Act). This statute was adopted in 1966 and was based
almost entirely upon recommendations contained in the *Re-
port of the Governor's Committee on Local Property Taxation*
submitted December 15, 1965. (*Report*). *Foosaner v. Di-
rector, Div. of Taxation,* 58 *N. J.* 57, 60 (1971). One of the
avowed purposes sought to be achieved by this Act and other
companion legislation adopted at or about the same time, was
the creation of a fiscal climate in New Jersey that would be
attractive to corporations and industry generally. Hitherto,
machinery and equipment used in business had been taxed at
the local level at disparate rates and with unpredictable re-
sults. As was pointed out in the *Report*

The Governor's Committee on Local Property Taxation has con-
cluded that it would be in the best interests of both our taxpayers
and our municipalities to eliminate the present system of taxing busi-
ness personal property. The present system has led to a type of
taxation which is particularly onerous to many businessmen because
a property tax bears little relationship to a business's capacity to
pay. In addition the tax has been a deterrent to business growth and
activity because its application and its computation has been un-
predictable in many cases. The businessman often does not know
what his community will require from him by way of taxes in any
given year and this uncertainty, in many respects, is even worse than
the magnitude of the tax burden itself.

[*Report, supra* at 51]

And further:

> The proposed tax on machinery and equipment, for example, would be levied on a State level. This would eliminate the difficulties caused by local administration as well as the use of such a tax as a competitive factor between municipalities. This replacement tax should also be more acceptable to most of the business community because it is geared to a fixed State rate rather than tied to the shifting general tax rate of each municipality. In addition, the amount to be raised from this source is substantially below the amount which is now being raised from machinery and equipment on a State-wide basis. This should enable New Jersey to compete more effectively with our neighbors for new industry. Since industrial and manufacturing concerns generally have greater freedom in the selection of plant locations than do commercial businesses, such an improvement in the tax structure is necessary if we are to increase New Jersey's attractiveness to such businesses.
>
> [*Report, supra* at 55]

Thus the proposed new tax would be uniformly applied at the state level and would be designed to raise less money than theretofore. These characteristics were openly designed to attract industry. To the extent that machinery and equipment may continue to be taxed at the local level, quite clearly this endeavor is frustrated. The aims and purposes of the legislation would seem to receive maximum support from a judicial interpretation of the statute favoring imposition of tax at the state rather than at the municipal level.

Pertinent legislative activity since the adoption of the Act in 1966 strengthens this conclusion. *L.* 1977, *c.* 4, codified at *N. J. S. A.* 54:11A–3.1, provides that any machinery or equipment acquired after January 1, 1977 shall not be taxed at all. The statement of purpose attached to the bill (Assembly 1766) at the time of its introduction, stated,

> This bill as amended . . . is intended by its proponents to make capital investment in New Jersey more attractive. . . .

More directly in point, *L.* 1978, *c.* 151, codified at *N. J. S. A.* 54:11A–3.2 to 3.4 states that

[f]or the purposes of assessment of taxes, cranes and structures attached thereto essential to their operation, which are primarily used for the loading and unloading of containers from containerships docked within the various ports and harbors of the State shall be deemed to be tangible personal property used in business and shall not be assessed and taxed as real property. [*N. J. S. A.* 54:11A–3.2]

The statement appended to the bill (Assembly, No. 543) at the time of its first introduction, with respect to its purpose, said,

The purpose of this bill is to make clear the intent of the Legislature in providing for the assessment and taxation of real and personal property that only those lands and improvements traditionally considered as real property are to be assessed and taxed as such, and that business machinery such as large cranes which are sometimes attached to other structures for support and operation are personal property used in business and are to be assessed and taxed as such.

We recognize, of course, that these later enactments took place several years after the dates of the assessments under review and they obviously have no controlling import here. They do, however, manifest a continuing legislative concern that found its roots in the earlier Report and the legislation that gave expression to the recommendations contained in that Report.

In brief recapitulation, we discern a legislative intent, apparent at least as early as 1966 when the recommendations of the Report were adopted and the Act was passed — and certainly continuing to the present time — to create in New Jersey a fiscal climate that will contribute to the attraction of industry. A significant step in the implementation of this legislative endeavor was the removal of the burden of local property taxation from machinery and equipment used in business. We give great weight to this legislative aim and purpose in reaching our conclusion that these cranes are not subject to local taxation.

For the foregoing reasons the judgment of the Appellate Division is reversed and that of the State Division of Tax Appeals is reinstated.

*For reversal and reinstatement*—Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—6.

*For affirmance*—None.