RCA CORPORATION, PLAINTIFF, v. EAST WINDSOR TOWNSHIP, DEFENDANT.

Tax Court of New Jersey

September 18, 1980.

*Levy, Levy, Albert & Marcus, Philip J. Albert* for plaintiff.

*Warren, Goldberg & Berman, Robert A. Gladstone* for defendant.

EVERS, J. T. C.

RCA Corporation (taxpayer) occupies the premises which are the subject of these 1973 through 1976 appeals under net leases with the United States Steel and Carnegie Pension Fund pursuant to which taxpayer pays all expenses, including taxes, on the premises. Taxpayer claims that the assessments imposed by East Windsor Township (township), all of which were affirmed by the Mercer County Tax Board, exceed true value. Taxpayer's claim of discrimination in township's assessing practices has been rendered moot. This claim was based on township's attempts to value certain of taxpayer's equipment as real property while not applying the same assessing practice to similarly situated taxpayers in the township. In view of the decision in *City of Bayonne v. Port Jersey Corporation and Global Terminal and Container Service, Inc.*, 79 *N.J.* 367, 399 *A.*2d 649 (1979) the parties stipulated that the equipment in question should be assessed as personal property.

The assessment history of these two contiguous lots which are operated as a single unit is as follows:

|  | Block 2, Lot 1 | Block 2, Lot 2 | |
|---|---|---|---|
|  | 1973 through 1976 | 1973 | 1974, 1975, 1976 |
| Land | $324,200 | $1,073,400 | $1,073,400 |
| Improvements |  | 7,386,500 | 7,493,800 |
|  |  | 107,300 [1] |  |
| Total | $324,200 | $8,567,200 | $8,567,200 |

Both parties employed the market approach in valuing the land and the cost approach in estimating the value of the improvements. Taxpayer's estimate of value was $5,055,000 while in township's opinion the premises had a value of $8,895,450. Because functional and economic obsolescence considerations accounted for much of the vast differences in their respec-

---

[1] Added assessment—11 months.

tive opinions of value an understanding of the nature of taxpayer's operations is required.

The premises are occupied by taxpayer's Astro–Electronics Division (AED) which makes use of the facility for administrative, research, design, assembling and testing of small to medium sized satellites, space hardware and components. Taxpayer has long been recognized as a pioneer in the electronic communications field as well as being one of the major manufacturers of transmission and reception equipment. It was therefore a logical step for taxpayer to move into the space technology field. In 1951 it pioneered in–space technology with a feasibility study of the use of satellites instrumented for recognizance of ground targets. AED was organized in 1958 and has performed work in communications, meteorological (weather) and scientific spacecraft systems.

The area in which AED has provided complete spacecraft generally is referred to as unmanned spacecraft which are much smaller than manned craft and are not concerned with life–support systems. The manned spacecraft field is more naturally the province of companies that build aircraft. As of the early 1970s AED had successfully launched 21 spacecraft in the weather satellite field. During the period in question AED was producing TIROS–N and a military craft in the weather satellite field.

AED is also deeply involved in the communications satellite field and has produced several such spacecraft for the Department of Defense as well as for its own (RCA) use. AED is also active in a third class of unmanned craft which gathers and transmits back to earth certain scientific data. In addition to providing complete spacecraft AED designs and produces instruments for other spacecraft builders. AED systems have been incorporated in larger spacecraft such as the Apollo manned spacecraft.

Taxpayer's operations are conducted on a tract of land of irregular shape having a frontage of approximately 2,362 feet on Edinburg Road and approximately 3,260 feet on Millstone

Road, both of which taxpayer characterizes as being two–lane, rural roads. Hence, taxpayer reasons that its lands have considerably less value than similar lots fronting on the nearby Princeton–Hightstown Road, a major artery. However the exhibits and testimony amply support township's contention that, as a practical matter, the location of the facility on Edinburg and Millstone Roads is inconsequential in terms of valuation. The facility is clearly visible from Princeton–Hightstown Road; is located approximately 800 feet therefrom and is easily accessible from that artery. I find that the effect on value of its technical location on Edinburg–Millstone Roads is negligible.

The tract contains a total of 115.7 acres of which approximately 30 acres are within an area containing wetlands, woodlands and a river. The Millstone River makes up its eastern boundary line. The property is zoned agriculture–commercial which requires a minimum lot area of 10 acres, a front setback of 100 feet and limits the coverage to a maximum of 60%. The actual land utilized by the facility is 22.86 acres with approximately one–half thereof being devoted to setback purposes. Township's municipal sewer treatment facility is located to the rear of the tract on Millstone Road.

The land is generally level. The area immediately surrounding the buildings is seeded, lawned and has paved parking areas sufficient to accommodate over 1,500 vehicles. The site is attractive and was described by township's expert as having a "campus–like" appearance. The site has its own well water. Municipal sewers, as well as gas and electric, are available.

East Windsor Township, then and now, is a rapidly expanding municipality. The population, as estimated by the 1970 census, shows a 410% increase over 1960. Transportation facilities are adequate. The New Jersey Turnpike, Routes 1, 33, 130 and 206, all major thoroughfares, are in close proximity. Located nearby is the Twin Rivers complex, one of New Jersey's first planned unit developments, which offers a complete mix of housing, industry and commerce. When completed the development will have approximately 3,000 dwelling units and a population of 10,000 people.

The improvements, all of which were completed during the 1957–1970 period, contain over 250,000 square feet of ground floor area in seven separate or connected buildings. The paved parking areas consist of approximately 600,000 square feet. There are two vertical steel water storage tanks. More detailed descriptions of each improvement follows the parties' land value analyses.

### Land

Taxpayer's expert compared the subject land with the sale of nine tracts in the township to support his opinion of land value. These sales took place between April 1969 and May 1973 with prices ranging from $3,000 to $9,428 per acre. They ranged in size from 3.5 acres to 497.4 acres. On the basis of these sales taxpayer's expert estimated the subject land to have a value of $6,000 an acre for a total of $694,200, rounded to $700,000.

Township's expert, a member of the firm which performed the 1973 revaluation, treated the tract as consisting of four distinct areas as follows.

(a) The plant site fronting on Edinburg Road containing 22.86 acres at $25,000 per acre;

(b) Millstone Road frontage containing 15.61 acres at $10,000 per acre;

(c) Interior lots containing 47.23 acres at $5,000 per acre;

(d) Swampland containing 30 acres at $3,000 per acre.

While this area breakdown was not followed by taxpayer's expert witness in his land value analysis the taxpayer itself looked upon the entire tract in this fashion and it was RCA representatives that first suggested the idea and furnished the breakdown to township's expert. The separation into these categories does bear a relationship to the use, location and topography of each physical portion of the tract and while only one total value will be attributed to the land in each tax block, these areas will be utilized by the court in its analysis of land values.

Township's expert based his land values on five sales in the township between April 1969 and December 1972 which contained between 9.45 acres and 104.5 acres. Sales prices ranged from $5,179 to $20,460 per acre or an average of $10,235 per acre. On the basis of these sales township's expert determined the four categories of land to have the values set forth above. The subject lands, on the basis of this appraisal had an average per acre value of $9,100 which, according to township's witness, favorably compared with the $10,235 per acre average of the comparable sales lands. No explanation was offered of the less favorable comparison with the assessed valuation which was based on the 1973 valuation which was $343,600 greater.

In this factual situation and in determining the value of the subject lands through a study of the 14 comparable sales offered by both parties, I find the most important criteria to be size, zoning and availability of utilities, all three being interrelated. For instance, during the time in question a sanitary sewer hookup moratorium was in effect which, with but one exception, as a practical matter banned the development of vacant land in the township. Excepted from the moratorium which became effective in 1972, was the PUD zoned area known as Twin Rivers.

The zoning is also important in terms of minimum lot sizes and land coverage. It appears that the PUD zone was superior in terms of attractiveness to potential purchasers in that it was extremely flexible; its basic requirement apparently being that a proper balance be maintained between residential, commercial, industrial and open areas. Industrially zoned lands required only a four acre minimum area while lands such as the subject which are located in the agriculture–commercial zone have 10 acre minimum lot requirements.

Other important elements in the comparison test include topography, frontage and location. Topographical problems are often curable through proper grading and the introduction or removal of soil from the premises. Frontage, while desirable, is not an essential ingredient in the overall development of those

lands zoned for industrial park or agriculture–commercial use. Although good frontage may add to the attractiveness of an industrial type use from an aesthetic–environmental point of view, it is not as essential as it would be in the case of shopping centers and other retail type uses where visibility and easy access is important.

In these circumstances the location of a tract for those uses permitted in industrial and agriculture–commercial zones in East Windsor Township is not deemed to be an overriding consideration in the comparability test. In the view I take of this matter little weight is attributed to the considerable testimony introduced concerning the rural versus urban characteristics of the various areas of the township. East Windsor is not the little hamlet it may have been when incorporated in 1797. Although sparsely populated for many years in the 1960s it took on new forms of development due to the overflow of population from Princeton, Hightstown and other nearby well populated areas. Its network of roads makes travel over the 15.6 square mile township relatively easy and fast. A motorist could traverse the township from boundary to boundary in a matter of minutes. Within an area of five miles there are 65,000 people and stores and services of all types. Within a radius of 75 miles the population is 75,000,000 (Philadelphia–30 miles; New York–60 miles) and within overnight trucking distance is 28% of our nation's population. It is served by all modes of transportation including the Mercer County Airport (15 miles distant); three branches of the Pennsylvania Railroad and the aforementioned major highways. Shopping, recreational and educational facilities are all available within or in close proximity to the township. I agree with taxpayer's expert witness that East Windsor has provided a sound industrial, commercial and residential growth pattern and, if continued, will develop into one of the county's more populated communities. While one may still see considerable vacant land and farms, it is unrealistic to refer to one part of East Windsor as being rural and another urban. As a result, I find that the value of a specific parcel of property when compared to the subject, because of location, will not be greatly enhanced or decreased.

Applying the foregoing criteria to the comparable sales, it is found that the area of only two sales properties favorably compares with the subject land. Taxpayer's sale number 5 consists of 70 acres which is zoned residential (subject to moratorium) but, because of its location off Route 33 and bordering the New Jersey Turnpike, has the highest and best use for industry or corporate headquarters. It was sold in March 1972 for $4,728 an acre. Township's sale number 1 consists of 104.5 acres but is located in a PUD zone (sewer available). It was sold in August 1971 for $8,760 an acre. The only other sale of a fairly large tract was taxpayer's sale number 7 which consisted of 497 acres and contained farm and residential land (sewer moratorium). It was sold in May 1973 for $3,518 an acre.

I further note that both experts utilized the sale of a 19.3 acre tract (taxpayer's sale number 2 and township's sale number 3) located on Edinburg Road approximately 500 feet distant from the subject lands which was located in an industrial zone (no sewers) and which was sold in February 1970 for $5,100 an acre. Both experts also referred to the sale of 17.2 acres (taxpayer's sale number 1 and township's sale number 5) which is located in an industrial zone (no sewers) which were sold in April 1969 for $5,580 an acre.

Little or no weight is attributed to the remaining sale testified to by the experts as they were either relatively miniscule in size, were assemblages by contiguous property owners, or for the reasons earlier stated, were totally incomparable. Additionally, because of its size, topography, zoning, shape and use, little weight is attributed to the 497 acre transaction.

An analysis of the four sales most heavily relied on reveals that three of them fall within the $4,700 to $5,500 per–acre bracket. Of these transactions I find that the property located on Edinburg Road, some 500 feet distant from the subject, which was sold two and one–half years prior to the critical assessing date for $5,100 per acre and which was cited by both parties, is the most reliable. Although it is generally accepted that smaller tracts command a higher per–acre sales price, I find

that principle to be inapplicable to this slightly less than 20 acre parcel.

I further find that this parcel most favorably compares with that portion of the subject parcel fronting on Millstone Road which consists of 15.61 acres. Adjusting for the time of sale and the superior topography of the Millstone Road acreage I find the Millstone Road portion of the subject lands to have a value of $7,500 per acre. This price is supported by the April 1969 sale of the 17.2 acre parcel for $5,580 per acre which land was obviously superior to the Millstone Road tract. It finds further support in the March 1972 sale of the 70 acre tract off Route 33 which was zoned residential and which is inferior to the subject in terms of topography. The difference between the value I have found and the per–acre sales price of $8,760 for the 104.5 acre tract which sold in August 1971 can be accounted for because of the very favorable zoning and availability of sewers to the sales parcel.

By applying the per–acre price of $7,500 to the 15.61 acre Millstone Road portion of the tract the value thereof is found to be $117,075. Allowing for the lack of road frontage and the consequent need for introducing roadways and utilities into the interior 47.23 acre section a reduction of 25% ($1,875) from the average per–acre price of $7,500 is reasonable. I find the value of the interior section to be $5,625 per acre for a total of $265,669.

When compared with the Millstone Road (rear) area of this tract the Edinburg Road portion is found to be superior in terms of topography, location and accessibility. It also is not burdened with the present and potential nuisance attached to the large sewer treatment plant which is located on Millstone Road. For these reasons I find the 22.86 acre Edinburg Road area to have a value of $10,000 per acre or $228,600.

The last section which taxpayer identified as a 30 acre wet and swampy area is that portion of the property which includes the Millstone River. The agriculture–commercial zone requires a minimum 200 foot setback from the natural flood plain of the

river.   The river makes up the entire northerly boundary of the land;   a distance of approximately 2,500 feet and thus approximately 500,000 square feet or 11.5 acres has virtually no utility to taxpayer.   Accordingly, a nominal value of $750 per acre, or 10% of the value attributed to the Millstone Road acreage, will be attributed to this acreage.   I find no material difference between the remaining 18.5 acres of this section and the interior lands to which a $5,625 per–acre value was assigned.   Accordingly, I find the value of the 11.5 acres to be $8,625 and of the 18.5 acre balance to be $104,063 for a total of $112,688.   The value of the 115.7 acre tract is $724,032 with $167,903 attributed to Block 2, Lot 1 and $556,129 to Block 2, Lot 2.

The land value is $330,000 less than that estimated by township's expert.   As previously noted his land value estimate was $344,000 less than that found by his firm whose revaluation was effective for the 1973 tax year.   It is obvious however that the witness underwent considerable strain in arriving at even his reduced values.   As previously stated his sales number 3 and 5 were also utilized by the taxpayer and the court.   The remaining three sales all satisfy the requirements for industrial development, enjoy the availability of sewers and were in the favorable PUD zone.   One of these transactions (number 1) was used in the court's analysis for two reasons.   First it consisted of 104.5 acres and thus favorably compared with respect to size. Secondly it clearly indicated the added value resulting from the availability of sewers.   Sale number 2 was to Johnson and Johnson which owned both land and a building adjacent thereto and it was acquired for future expansion.   Sale number 4 was similar in that the purchaser acquired 9.45 acres which were immediately adjacent to land owned by it.   By eliminating the use of these two sales which average $20,000 an acre township's value estimate differs little from that found by the court and by taxpayer's expert.

## Buildings

Probably because of the unique and technical features of AED's use of the facility both experts considered each building

to be a special purpose structure and thus relied solely on the cost approach to estimate value. However, as to at least two of the structures, the evidence does not support that position. In view of the fact that only the cost approach was used, however, we are limited to that approach in our analysis.

That approach consists of two procedures; first the land is valued as if vacant and unimproved and secondly the improvements are valued on the basis of the cost to duplicate new improvements (reproduction costs) or on the basis of the cost of modern improvements which can perform ·the same service (replacement cost). From this estimate is deducted the loss in value from all forms of depreciation; physical depreciation, functional and/or economic obsolescence. To this result is, of course, added the land value.

The manual was the primary source of establishing values in East Windsor in connection with its revaluation program. Both parties also utilized the manual in developing their respective cost approaches. The basic differences between the appraisal experts' conclusions can be found in discrepancies in the size of the structures, the classification of each building and the amount of depreciation allowed. Taxpayer estimated the value of the improvements at $4,277,000 while township estimated their value to be $7,841,700 or $347,900 greater than the assessment. However, township's estimate included the value of various equipment which was subsequently stipulated to be personal property. These estimates do not include. a structure known as building 402A which was constructed in February 1973 and which assessment of $107,300 was accepted by taxpayer. An analysis of the court's findings of the value of each building follows, after which the claims of functional and economic obsolescence are addressed.

*Building 401*

This structure is a one story general purpose building which had an actual age of 15 years. It was built in sections between 1957 and 1961 and contains, among other things, the engineering

and research departments, machine shops, photo laboratories and cafeteria. Much of the area is divided into office space by series of eight foot finished veneer partitions. The ceilings are exposed and painted. The heat pipes, ducts and electrical work are exposed. Fluorescent fixtures are hung from the ceiling.

Taxpayer estimated its value, before depreciation, to be $1,546,500 while township valued it at $2,117,406. The major differences in the respective estimates are accounted for in the use of different building areas, wall types and township's additional value for electric wiring and physical depreciation.

Taxpayer calculated the area to be 117,876 square feet while township found it to be 128,308 square feet. As was the case in all building measurements taxpayer's expert made independent calculations which were buttressed by diagrams prepared by RCA representatives based on actual measurements. Township's witness, as was the case in all buildings, admitted that he made no independent calculation but simply accepted those made by the revaluation representatives. In addition to the mathematical discrepancies part of the difference in area is reflected in the exclusion of taxpayer's calculations of certain corridors leading from this structure to building 409 which was of a different height than building 401. The corridors were of different construction, were not air–conditioned and were designed primarily for protection from the elements. The value of these corridors however was added to taxpayer's valuation of building 409 where it rightfully belongs. I accept taxpayer's contention that building 401, for purposes of this valuation, contains 117,876 square feet.

In accordance with the manual both experts found this structure to be Class 41.5. However township's expert found it to have a base value of $5.94 per square foot (based on wall type D, solid brick curtain walls) while taxpayer classified it as wall type B (concrete block or hollow tile curtain walls) and valued it at $4.64 per square foot. My review of the record convinces me that the more appropriate class was 41.5B as used by taxpayer.

I also disagree with township's claim of additional value due to electric wiring. I find the basic 41.5 class includes basic electrical service and calls for no additions unless there is a considerable difference in the type of service actually provided. That difference did not exist here and no additional cost is required. Both parties used identical cost conversion figures in all valuation procedures.

Based on the foregoing I find the current cost to be $1,546,-500. I find the effective age of this building to be 15 years and will thus allow 10.5% physical depreciation based on the manual. The value of building 401 after physical depreciation is found to be $1,384,110.

### Building 402–403

This one story structure is known as the environmental test chamber and is 13 years old which I also find to be its effective age. It is used by AED to test the satellites for temperature and vibrations. The differences in taxpayer's estimate of value before depreciation ($447,518) and that of township ($511,688) is found in the use of different base costs and township's additions for electric wiring. As to the latter, as in the case of building 401, I find no additional value is required.

While both experts classified this structure as 41.5B taxpayer's witness applied a unit cost of $.16 per cubic foot while township's appraiser calculated it to be $.215 per cubic foot. On cross examination township's witness admitted to miscalculating the height of the building which accounted for the difference in the base cost. In accepting the $.16 factor urged by the taxpayer I note that the revaluation firm utilized a cubic foot cost of $.156. Based on the foregoing I find the current cost to be $447,518. After deducting 9.5% for depreciation based on the manual the depreciated value of building 402–403 is found to be $405,004.

### Building 409

This structure basically houses the satellite assembly area and was constructed in 1970. It thus had an actual and effective

age of two years. While it is predominantly a one story building of heights ranging from 15 feet to 44 feet it contains a three story center area which houses the mechanical equipment and contains approximately 9,640 square feet. It also contains an office area on the second floor of the three story center section. It also has a three floor passenger elevator. Taxpayer valued the structure before any depreciation at $923,422 while township estimated its value to be $1,972,516. The vast differences in the expert's estimate of value are found in the fact that each classified it differently, because of disagreement as to the amount of office area and in the additions made by township for what it referred to as special features.

Taxpayer calculated the cost of this building on the basis that it was a one story industrial concrete block structure and found it to be Class 41.5B. The expert then made adjustments for the multi–story portion. Township's expert viewed it as a multi–story building and classified it as 42.3B. The facts do not support township's position. Only 40 feet of this 214 foot long building contains three floors with the remaining area being one story with heights varying from 15 feet to 35 feet. The inconsistency in township's position is noted in the view taken of building 402 which was classified as a one story structure despite the fact that it was 75 feet high over a length of 120 feet. I accordingly accept both the methodology and the base costs utilized by taxpayer.

It cannot be disputed that the only area devoted to office use in this structure was the second floor of the three story center section which contained 9,600 square feet. Township however, with the exception of the unfinished third floor of approximately 15,000 square feet, found the entire building to be office area; some 60,000 square feet. Township is in error.

With respect to the alleged special features which include removable crane trackage, a TV monitoring security system and special air–conditioning equipment, township added $411,000 based on taxpayer's actual cost. I find that these items are required only for production and security reasons and are re-

movable without causing serious or irreparable damage to the realty. While this structure is determined to be a special purpose building I further find these alleged special features are not essential to that determination. Accordingly I find that such items are not taxable as real property. As was stated in *Bostian v. Franklin State Bank,* 167 *N.J.Super.* 564, 577, 401 *A.* 2d 549 (App.Div.1979):

> The test as to whether personalty has become so affixed to the building as to form part of the realty was recently redefined by the Supreme Court in *Bayonne v. Port Jersey Corp.,* 79 *N.J.* 367 [399 *A.*2d 649] (1979). No longer applicable is the "institutional doctrine" whereby chattels were treated as realty where their removal "will prevent the structure from being used for the purpose for which it was erected or for which it has been adapted." *National Lead Co. v. Sayreville,* 132 *N.J.Super.* 30, 39 [331 *A.*2d 633] (App.Div.1975); *Smyth Sales Corp. v. Norfolk B. & L. Ass'n,* 116 *N.J.L.* 293, 298 [184 *A.* 204] (E. & A.1935). The test now relevant is whether removal of the chattels "will do irreparable or serious physical injury or damage to the freehold." *Bayonne v. Port Jersey Corporation,* supra at 79 *N.J.* at 378 [399 *A.*2d 649]; N.J.S.A. 54:11A–2.

I note further that township's special features cost calculations include the electric work and panelling on some of the walls in spite of the fact that at least part of such costs had already been considered in prior calculations. I further observe that township's expert (as did taxpayer's expert) had provided for the cost of air–conditioning in his prior calculations; that the only air–conditioning provided in certain sections of this building was through the special equipment needed for production purposes (control of temperature, humidity and cleanliness), and thus, even if such equipment was in fact considered real property there was a duplication of approximately $118,000. No additional value will be allowed for the alleged special features.

For reasons previously stated in my analyses of buildings 401 and 402–403 no extra value will be allowed for electric wiring as urged by township by reason of the fact that such costs are included in the base costs. I take the same view with respect to township's position regarding the finish flooring. However the sums of $32,804 for corridors (previously described in connection with building 401) and $43,384 for floors in that area of the structure which is three stories high will be added.

The total replacement cost is found to be $923,422. After allowing 1.5% for depreciation for this two year old structure pursuant to the manual, the value of building 409, after physical depreciation, is $909,571.

### Building 411–415

This two story building which was constructed in 1962, is devoted primarily to office and laboratory use. It averages 30 feet in height and contains, according to the taxpayer, 2,076,030 cubic feet; (township estimates its area to be 150,498 cubic feet less). Each floor has tile flooring, suspended acoustical tile ceilings and is divided into office–laboratory area with furnished wood partitions. The partitions are not floor–to–ceiling height and are approximately four to six feet high. It contains a freight elevator and, as is the case with all other buildings, is fully air–conditioned and sprinklered. The basic differences in the valuation estimates–$2,543,719 by taxpayer and $3,669,139 by township–are found in the building classification and treatment of the office space. A review of the testimony and exhibits convinces me, for the reasons earlier stated, that no additional value will be allowed for electric wiring as urged by township.

Both experts found this building to be in Class 25.06 pursuant to the manual. However taxpayer selected wall–type B (face brick front with concrete block on the sides and rear) and township selected wall type C (face brick front with common brick on the sides and rear). The selection of the appropriate wall type is most meaningful as type B is valued at $.59 per cubic foot and type C at $.66 per cubic foot which, in this instance, produced a difference in excess of $250,000.

A review of the evidence makes it clear that the exterior wall construction does not fit snugly into either type B or C. Clearly approximately one–half of the walls are faced with brick with the upper portions consisting primarily of metal facade and panelling and windows. The walls are backed up with concrete block. The facades and panelling are non–load bearing.

I find that through the use of wall type B no material adjustments would have to be made to the base cost as would be required in the use of type C. While township's witness suggested that the brick used was "face brick" no such proof was brought forth. While taxpayer made no addition to his value computations for any covering over the concrete block walls, neither was a deduction taken for the fact that approximately one–half of the walls consisted of non–load bearing decorative panels. I find that one factor offsets the other. Accordingly, I find the proper classification of this structure to be 25.06B and will value it on the basis of $.59 per cubic foot.

The issue concerning office area creates an even more substantial discrepancy between the parties as it represents a difference of over $575,000 in their respective opinions. Township's expert viewed the entire building as containing small commercial type offices and added a unit cost of $2.35 for 137,538 square feet as permitted by the manual. At the outset I note that Class 25.06B and C already have built into it a 25% factor for small offices. Therefore, assuming the correctness of township's position, it is obvious that only 75% of the space would qualify for the adjustment. By adding $2.35 per square foot to the entire area there is a duplication as to 25% thereof. I further note that Class 25.06 has built into its base cost a factor of $.92 per foot for large open space and thus again, assuming the correctness of township's position, it is obvious that any addition for small office space must be limited to $1.43 per square foot or the difference between $2.35 and $.92 per square foot. This duplication amounts to over $281,000.

I disagree with township's position for two reasons. First I do not perceive it to be in keeping with the philosophy and purpose of the manual to mandate that a $.92 per square foot cost for large open office space be increased to $2.35 per foot through the simple placement of four to six foot dividers in the room. These temporary type walls simply serve as a convenience and afford some degree of privacy to the occupant of the area in carrying out his duties. By no stretch of the imagination can these divided areas be equated with the small commercial type

offices that are constructed for rental purposes and which will return an income to an investor.

Secondly, and more importantly, I find that the facts simply do not support township's position. To the contrary it is clear that there existed many large open areas on both floors, some of which were 100 feet in length or width. In fact township's witness even admitted to one area being 150 feet in length. While some portions of this building did contain permanent small offices I find that such areas did not exceed the 25% limit already considered in the base cost of Class 25.06. I therefore reject township's claim and will not allow any additional value for small office space. I find the value of building 411–415, after allowance of 8% for physical depreciation pursuant to the manual, to be $2,340,222.

### Miscellaneous Buildings and Improvements

The balance of the improvements consist of three sheds, two water tanks and asphalt paving. As to the tanks and paving the experts' respective opinions of value differed by only $4,100. With respect to the three buildings, taxpayer's estimate of value before any depreciation was $96,832 or $56,563 greater than the township's witness' opinion of $40,269. By allowing the rates of depreciation as contained in the manual, taxpayer found the total value, after physical depreciation, of these miscellaneous improvements to be $283,158 or $39,000 greater than that estimated by township's expert.

Throughout this analysis of the values of the various improvements I have accepted the estimates of value advanced by taxpayer. The opinion of an expert depends upon the facts and reasoning which forms the basis for the opinion. *Passaic v. Gera Mills*, 55 *N.J.Super.* 73, 150 *A.2d* 67 (App.Div.1959), certif. den. 30 *N.J.* 153, 152 *A.2d* 171 (1959). I have found the methodology employed by taxpayer's witness to be in accordance with that suggested by the manual. His conclusions find considerable support in the record, in the exhibits, in the market place and in the application of common sense. In contrast the testimony of

township's witnesses was often vague, unsupported and based on unwarranted assumptions. In their defense however I observe that while township's principal witness was a member of the firm that performed the 1973 revaluation he did not personally partake in much of the work. He did not have the benefit of the in–depth knowledge afforded to taxpayer's witness who was active in East Windsor for many years and who availed himself of the engineering, planning and construction data and expertise of the plant's personnel.

The reasons I found to support taxpayer's estimates of value of the other improvements to the property also obtain with respect to the value of these miscellaneous improvements. I find the value of these improvements, after physical depreciation, to be as follows:

| | | |
|---|---|---|
| Building 404 | – | $20,075 |
| Building 405 | – | 30,046 |
| Building 420 | – | 35,079 |
| Tank (150,000 gals.) | – | 9,563 |
| Tank (100,000 gals.) | – | 29,904 |
| Asphalt paving | – | 158,491 |
| Total | | $283,158 |

In summary I find the values of all improvements, after physical depreciation, to be as follows.

| | | |
|---|---|---|
| Building 401 | – | $1,384,110 |
| Building 402–403 | – | 405,004 |
| Building 404 | – | 20,075 |
| Building 405 | – | 30,046 |
| Building 409 | – | 909,571 |
| Building 411–415 | – | 2,340,222 |
| Tank (150,000 gals.) | – | 9,563 |
| Tank (100,000 gals.) | – | 29,904 |
| Asphalt paving | – | 158,491 |
| Total | | $5,322,065 |

In arriving at the foregoing conclusions I am not unmindful of township's argument that original construction costs of the improvements should be considered. I agree with that argument. The actual construction costs were considered but I find that they are not controlling. The search here, as it is

in all such matters, is for value. Cost may, as often as not, include added expenses caused by difficulties encountered in preparing the site for construction, expenses incurred through change orders, underestimation of real estate taxes, operating expenses and the like. These may represent cost but they do not represent value. As was stated in *Bostian v. Franklin State Bank*, supra, the original cost of construction should be considered but it is not controlling. The language from *Bostian*, 167 *N.J.Super.* at 570, 401 *A.2d* 549 is appropriate here.

> The utility of cost figures, whether estimated or actual, lies in the fact that they are or may be criteria illuminating the ultimate question of fair market value. For taxation purposes fair market value is the price which could be obtained for the property, in money, at a fair sale between a willing seller not obliged to sell and a willing buyer not obliged to buy. *In re Appeal of East Orange*, 80 *N.J.Super.*, 219, 230–231 [193 *A.2d* 377], certif. den. 41 *N.J.* 200 [195 *A.2d* 468] (1963); *Sorokach v. Trusewich*, 35 *N.J.Super.* 86, 89 [113 *A.2d* 194] (App.Div.1959); *N.J.A.C.* 18:12–4.8(a). That a building was "overbuilt", as the assessor and the bank's expert opined this one was, either to satisfy the whim of its owner, or to meet a special purpose, or out of extravagance, does not command the expectation that such an investment will be reflected in the building's fair market value. 84 *C.J.S. Taxation* § 411 at 804. As stated in *Haworth v. State Board of Tax Appeals*, 132 *N.J.L.* 306 [40 *A.2d* 353] (Sup.Ct. 1944);

> Cost is never conclusive on the question of value for tax purposes. Expensive buildings are frequently sold for much less than cost is common knowledge. [at 308, 40 *A.2d* 353]

> Clearly, the Judge of taxation was not obliged as a matter of law to base his determination of true value on the building's actual construction costs.

## *Obsolescence*

The manual at page 131 states the following concerning obsolescence.

> Obsolescence when applied to building valuation is the loss in property value over and above that caused by physical deterioration. It is a loss in value due to an excess of supply over demand or loss in desirability and use for specific classes of properties. Such loss in desirability may be traced to one or more causes, such as improper location resulting in over or under–improvement, changed neighborhood conditions arising from changes in use, population and residential and business shifts, or to lessened demand for certain uses or classes of commercial buildings caused by oversupply and/or economic conditions.

> Obsolescence is divided into two classes, namely Functional Obsolescence and Economic Obsolescence. Functional Obsolescence is the loss of value due to conditions which exist within the property itself. It may be curable, i. e., the cause of the obsolescence may be removed by modernization of facilities or

equipment, and it may also be incurable, i. e., features of the building which cannot be replaced or changed, such as inadequate or excess size and/or height, poor layout and other features which limit the use and desirability of the building.

Economic obsolescence is the loss of value resulting from conditions existing in the neighborhood, outside the structure. These conditions include (1) under–improvements and over–improvements, i. e., improvements that adversely affect either the sale value and/or the income of the property due to the fact that their existence does not permit utilization of the land for its highest and best use, (2) over supply, i. e., a greater supply of a given type of property than the market can absorb, (3) location, i. e., an area or neighborhood where inharmonious elements, transition from residential use to commercial use, shifts in desirability and demand within an area, obnoxious odors, noise, dust, etc., adversely affect the market value.

Functional obsolescence is normally caused by improved methods, design, layout and materials which change the requirements of the physical plant. These conditions are usually present in older buildings but also may be found in relatively new structures which were planned for a specialized use or to satisfy the whims of the owner. Buildings which are designed for special uses have an extremely limited market and functional obsolescence is often applied to relatively new buildings which are not readily adaptable to other uses. If the adaption requires only the removal of walls or interior partitions, the obsolescence is curable and can be measured in terms of cost. However, if the construction is such that no change, other than demolition, is possible, the obsolescence is incurable and must be estimated in terms of a percentage.

The major appraisal discrepancy between the parties related to the application of functional and economic obsolescence in valuing the principal facilities. More testimony was devoted to this subject than to any other issue in the case. The parties took diametrically opposite positions. Township gave no consideration whatsoever to any functional or economic obsolescence existing at the time at the space center. Taxpayer, on the other hand, found an overall 20% net effect of economic and functional obsolescence of the entire facility.

As to functional obsolescence township based its refusal to make any allowance on the grounds that "... it appeared that all the buildings were being used to the fullest extent." Little or no effort was made to verify this conclusion or to determine the nature of the requirements of the activity at the facility. Clearly, that people are working in a building or that a building appears to be fully utilized in the manufacturing process is not the determining factor as to whether or not functional obsolescence exists.

In marked contrast to township's vague, unsupported conclusions taxpayer, which of course carried the burden of establishing the existence of obsolescence, offered considerable testimony concerning obsolescence. The witnesses traced the "hodge–podge" layout of the buildings which they alleged created a less efficient way of assembling and testing satellites. They pointed to the overall size of the complex, (seven separate and/or connected buildings containing over 250,000 square feet), and they pointed to the shape and the height (or in some instances the lack of height) of the buildings in support of this claim. Taxpayer's project manager traced the physical development of the facility noting that in 1958 building 401 housed its entire personnel of some 300 people. That building also contained the environmental testing facility which, according to taxpayer, soon became inadequate and was removed to another structure.

The project manager also claimed that because satellites were becoming larger, heavier and wider and because of the advent of the space shuttle era, much of the facility's physical structures, which are geared to the production of small to medium sized satellites, have become obsolete. He further noted that there exists an inherent obsolescence in the industry itself because of the difficulty in planning too far ahead due to the rapidly changing technology. In support of this position he detailed the difficulty in testing satellites in building 409; the need to disengage elements of the satellites and maneuver them from one area to another; how multi–stacked satellites had to be disassembled and thence reassembled in other areas in order to perform the tests. He opined that the buildings do not meet cleanliness standards; that future satellites will exceed existing building heights; and that the existing cranes will not have the capability of handling the increased weight of the satellites.

In terms of quantity taxpayer's testimony concerning obsolescence was considerable. In terms of quality; in terms of specificity and details however it was lacking in support of taxpayer's claim of 20% for obsolescence of the total facility. No breakdown of the 20% factor was given. To what degree were the structures, or any one of them, functionally and/or

economically obsolete? No answer is found in taxpayer's proofs. A close review of taxpayer's testimony reveals that its claim of functional obsolescence relates strictly to the manufacturing, assembling and testing of the satellites. Because the assembly and/or test areas may, to a degree, be obsolete it does not follow that the buildings containing offices, laboratories, machine shops, cafeteria and other such uses must also be found to be obsolete.

The fact that I have already determined that the original assessment exceeded the value of the structures after physical depreciation does not lessen taxpayer's burden of proving its claim of obsolescence through sufficient and competent evidence in terms of both quantity and quality. As to those structures primarily devoted to non–manufacturing, testing and assembly uses I find the taxpayer has not sustained its burden. As previously indicated, in spite of the fact that the parties looked upon all structures as being special purpose buildings, I do not accept the fact that those structures utilized for such purposes as offices, laboratories, machine shops, cafeteria, etc. are not, and cannot continue to be used for those purposes by this taxpayer or a successor to their fullest extent. I conclude likewise with regard to the sheds and water tanks.

In opposition to the claim of obsolescence township argues that taxpayer cannot benefit from hindsight. That position is correct as real property, for tax purposes, must be valued as of October 1 of the pre–tax year. *N.J.S.A.* 54:4–23. It is just as clear however that on the critical assessment dates functional obsolescence did exist in buildings 402–403 and 409 which were used for testing and assembly purposes. Taxpayer's unrefuted testimony overwhelmingly demonstrated such to be the case. To be determined however is the degree to which the structures are functionally obsolete.

As previously noted taxpayer did not separate functional from economic obsolescence. It simply applied a 20% obsolescence deduction to the value of the physically depreciated structures. A review of the testimony however indicates that it placed equal

weight on the two forms of obsolescence in arriving at the total deduction. Accordingly I agree with taxpayer's claim as to functional obsolescence of buildings 402–403 and 409 and find that a depreciation of value of 10% is justified.

In support of its claim of economic obsolescence taxpayer placed great reliance on what it perceived to be a trend in governmental expenditures on the space program. It noted that the United States had decreased its expenditures since 1965 from approximately $6.5 billion to about $3. billion in 1972 at which point it then levelled off until 1976. The witnesses pointed to the fact also that the government is performing aspects of the work which had previously been performed by the private sector. Taxpayer's witnesses also noted that, in many instances, AED was at a competitive disadvantage with some of its competitors which have more extensive facilities and are thus capable of handling the larger satellites. With the decline in government spending, the apparent trend to larger satellites and in–house work by the government taxpayer stated that it had to reduce its personnel from 2,200 at its peak to 835 in 1975.

The critical period under review is October 1, 1972 through October 1, 1975. During that period and in opposition to taxpayer's claim of economic obsolescence, township pointed to various internal projections authored by RCA representatives which indicated that the economic climate appeared quite favorable–not only for survival but for continued economic growth. Based on these exhibits township argues that, in spite of the alleged declining economic utility of the facility, AED management did not see fit to request larger or more sophisticated facilities to cope with the alleged problem of obsolescence. Township also cited the sales pattern achieved by taxpayer during this period which showed actual sales bookings rising from 1970 through 1973 with net sales being somewhat constant. Taxpayer's economic analyses projected growth patterns in the 10% range. Internal memoranda indicated that projected potential bookings would move from approximately $50. million in 1972 to $60. million, on a factored basis, in 1975; an increase of approximately 20% based on constant dollars.

The subjective nature of the company plans referred to by township destroys the very foundation of township's argument. Township argues, and rightfully so, that taxation of real estate demands stability. Inconsistent with that position, however, is township's reliance on the subjective albeit optimistic business forecasts of taxpayer's personnel. Stability in taxation cannot be achieved if it is to be tied in with the projections of a company plan.

However, for the same reasons, taxpayer can fare no better in its claim of economic obsolescence. While obviously a goodly percentage of spacecraft business is generated by the government the private market is still considerable and represents a prized target for taxpayer and its competitors.

It is also obvious that space technology is a rapidly developing and rapidly changing field. The total evidence is very persuasive in that regard. The evidence however does not persuade me to believe that RCA, an industrial giant and pioneer in the field, has not met nor will it be unable to continue to meet, these challenges. Certainly taxpayer had to be flexible in its use of this facility. It has had to make changes on a monthly, perhaps weekly or even on a daily basis. As taxpayer states it has had to "make do" in many instances. However I do not view these circumstances as entitling this taxpayer relief from real property taxation. Change is a fact of life as is the ability to adapt to change. It is not unique to the space industry.

Nor do I consider the changes in the industry resulting from changing governmental attitudes to be compelling reasons to reduce the value of this real estate on the basis of economic obsolescence. As rapid as are the changes in the space industry even more rapid are they in the socio–economic conditions in the world. There is very little predictability in this period of history–the only thing constant is change. Government plans with regard to size, shape and weight of satellites are all subject to the pressures of change. Government spending, or the lack of it, on space programs are likewise subject to the socio–economic pressures existing in the world. Many considerations

enter into the extent of government participation in such programs, not the least important of which is political in nature.

Similarly the extent of taxpayer's participation in such programs and the amount of people employed by taxpayer in connection with them is dependent on policy considerations by the taxpayer. These are based on subjective business judgments. That AED may or may not be the successful bidder on a specific contract, or that it may choose to not bid at all, cannot be permitted to dictate the amount of taxes one must pay on its real estate.

Claims for economic obsolescence, similar to those advanced by this taxpayer, over the years have been addressed by our courts. Underlying all court opinions on the subject is the basic proposition that there must be a measure of permanency in real property taxation. In *Hackensack Water Co. v. Division of Tax Appeals*, 2 *N.J.* 157, 163, 65 *A.2d* 828 (1949) the Supreme Court held that changed economic conditions do not ipso facto justify an increase in valuation. "This in itself is not a sufficient reason for an increase in value any more than a depression would call for a downward revision in accordance with new market conditions thereby created, however temporary". In *In re Erie Railroad System*, 19 *N.J.* 110, 129, 115 *A.2d* 89 (1955) the court said, ". . . assessors . . . should recognize the true value of a fixed asset, such as real estate, is fairly constant and must be gauged by conditions, not temporary and extraordinary, but by those which over a period of time will be regarded as measurably stable".

In view of the foregoing a further decrease in value of any of the structures on the basis of economic obsolescence is not justified.

### Summary

I find the true value of the property during the period in question to be as follows:

508

|              | Block 2, Lot 1 | Block 2, Lot 2 |
|--------------|----------------|----------------|
| Land         | $167,903       | $ 556,129      |
| Improvements |                | 5,190,608      |
| Total        | $167,903       | $5,746,737     |

The clerk is directed to enter judgments in accordance with the foregoing.