CONLEY, J.T.C.
This is a local property tax case in which the taxpayer, a home heating oil distributor, challenges its assessment on the grounds that its fuel oil storage tanks are business personal *539 property and should not have been assessed locally as improvements to real estate.
The 1981 assessment at issue (on Block 17-1, Lot 8 in Alexandria Township, Hunterdon County) was as follows: Land —$40,700, Improvements — $159,100, Total — $199,800. The assessment was modified by the Hunterdon County Board of Taxation to be as follows: Land — $40,700, Improvements— $138,100, Total — $178,800. The $21,000 reduction by the county board reflected a reduction in the assessment on plaintiff’s storage tanks from $52,600 to $31,600. Plaintiff seeks to have the assessment on the tanks removed altogether from the tax list. In the alternative it seeks a further reduction in the assessment on the tanks. The assessment on the land and the three buildings on plaintiff’s property, a six-acre tract fronting on a county highway, is not at issue. Nor is there any contention that the presence (or absence) of tanks has an impact on the value of the subject property independent of the value of the tanks themselves.
There are nine fuel oil storage tanks on the subject property that defendant assessed as real property. Four tanks are above ground and five are below ground. Of those above ground, the largest is a vertical cylindrical tank with a capacity of 150,000 gallons. It has a diameter of 30 feet and a height of 28 feet. The base of the tank rests on a bed of % inch gravel so that water can drain from beneath it. Nothing fastens the tank to the ground; it maintains its stability by virtue of gravity alone. Each of the other three above-ground tanks has a capacity of 20,000 gallons. Each is a cylindrical tank 10 feet in diameter and 30 feet in length. These tanks rest in a horizontal position on cradles made of angle iron. Nothing fastens any tank to its cradle. Each cradle consists of three separate support stands. Each stand has two legs, so that there are six iron legs under each tank. A flange on each of the six support legs is fitted over an anchor bolt set in a concrete pier and secured with a nut. Each concrete pier is two feet square and projects two feet above the ground and three *540 feet below. Plaintiff concedes that the piers should be taxed as real property.
Plaintiff purchased the 20,000-gallon tanks in 1951 and the 150,000-gallon tank in 1956. All were new at the time. All were delivered to the subject property on flatbed trucks. The largest tank was delivered in sections; the others were intact. In each instance a crane was brought to the site to unload the truck. The crane placed the sections of the 150,000-gallon tank on the ground to be welded together; it lifted the other tanks from the trucks and onto their cradles. Installation of the largest tank took approximately one week because of the welding required. The other tanks were installed in a matter of hours.
Essentially the same procedure could be used to remove these tanks from the site; they would be lifted by a crane from the ground or from their cradles onto a flatbed truck and transported to another location. This would be true even for the 150,000-gallon tank, although because of its size that tank would first be taken apart into its original sections by a firm of tank builders and refurbishers. All three 20,000-gallon tanks could be removed from the site in a few hours since each is a one-piece unit. The cradles for the 20,000-gallon tanks were also delivered to the site on flatbed trucks and set onto piers by a crane. These supports could be removed by the same procedure, in reverse, after a total of six nuts had been removed for each cradle.
Of the five underground tanks on plaintiff's property, three are 20,000-gallon tanks 10 feet in diameter and 30 feet in length, just like the 20,000-gallon above-ground tanks. The two other underground tanks have 30,000-gallon capacities and are 11 feet in diameter and 46 feet in length. All the underground tanks, like the ones above-ground, are constructed of lk inch steel sections welded together. The 20,000-gallon tanks were not new when plaintiff purchased them, having been used for 20 years as above-ground tanks. Plaintiff initially installed them as above-ground tanks at another location several miles *541 from the subject property. The larger tanks were purchased new in 1970.
Installation of all the underground tanks was accomplished according to a uniform procedure. Plaintiff used excavating equipment such as a bulldozer to dig a long hole and then lined the bottom of the hole with six inches of sand. Each tank was delivered on a flatbed truck and a crane lifted the tank off the truck and into the hole. The truck and crane then left the site. Plaintiffs men air-tested the tank to make sure it had no leaks, after which the tank was filled with fuel oil and the excavation was back-filled with the soil that had been removed. Soil that was not needed for fill was placed in a pile at the rear of the property. Typically it took one day to excavate for a tank, one day to set and test it and part of a third day to fill the tank with product and back-fill the excavation. When this installation had been accomplished all that was visible above ground was a metal cap set into a concrete pad approximately two feet square. The cap covers the top of the tank’s fill-pipe; the concrete pad keeps dirt from the pipe opening. Aside from this, the ground over the tanks is dirt and gravel indigenous to the site and is indistinguishable from the rest of the area in which the tanks are located — in plaintiff’s unpaved parking yard between two of its buildings.
Plaintiffs president testified that any underground tank could be removed in essentially the same manner as it had been installed, but in reverse order, in approximately two days. The major difference in removal would be that more of the digging would have to be done by shovel rather than by bulldozer to avoid damage to the tank. The soil previously removed to make the hole would be used to restore the ground to its original condition. However, it is not customary for underground steel tanks to be removed for re-use. The possibility of corrosion and leakage lessens their resale value and in fact there is virtually no market for them. There may be a market for used underground tanks made of fiberglass but plaintiffs tanks are all constructed of steel.
*542 Plaintiff uses its tanks to store home heating oil for distribution to its retail customers in the Frenchtown-Milford area of Hunterdon County. Plaintiff uses common carrier trucks to transport the product from the Trenton pipeline terminal of a major oil company to the subject property just north of French-town. At the property the trucks pump the fuel oil into a fill pipe on each storage tank. In the case of the 150,000-gallon vertical tank the delivery trucks use a pump kept at plaintiffs property rather than pumps on the trucks as they do for the horizontal tanks. When plaintiff fills its own delivery trucks from the above-ground tanks it does so by gravity from a pipe at the bottom of the tank. Since the 150,000-gallon tank rests directly on the ground, an area to the side of the tank has been excavated so that trucks can drive below the pipe from which fuel oil is drawn. This excavated driveway is not paved. Although plaintiff has not stored product in any of its underground tanks for several years for various reasons, it previously used them for extra storage capacity. At that time product was pumped from the underground tanks and channeled into the above-ground tanks as needed through a system of rubber hoses.
It is my conclusion for the reasons that follow that defendant Alexandria Township should not have assessed any of plaintiffs nine fuel storage tanks as real property. Most taxable business property in this State is taxed either by a local taxing district as real property pursuant to N.J.S.A. 54:4-1 et seq. or by the State as personal property pursuant to the Business Personal Property Tax Act, N.J.S.A. 54:11A-1 et seq. The issue in this case, of course, is which of these statutes controls the taxability of plaintiffs tanks. The latter statute expressly excludes the following property from the definition of “personal property used in business”:
goods and chattels so affixed to real property as to become part thereof and not to be severable or removable without material injury thereto____ [N.J.S.A. 54:11 A—2(b)(2) ]
Business property that does not come within the quoted language is taxed by the State as business personal property *543 unless it is otherwise exempt. Business property that comes within the quoted language is taxed by the local taxing district as real property.
The distinction between real property and personal property for tax purposes was dealt with recently in Bayonne v. Port Jersey Corporation, 79 N.J. 367, 399 A.2d 649 (1979). In that case the court concluded that the source of the language used by the Legislature in N.J.S.A. 54:11 A — 2(b)(2) had been the Uniform Conditional Sales Act, N.J.S.A. 46:32-1 to 33.[1] Id. 79 N.J. at 372-373, 399 A.2d 649. Basing its decision largely on this premise, the court said:
The meaning that the phrase ‘material injury’ had been given in the great majority of those states whieh had adopted the Uniform Conditional Sales Act was a test of irreparable or serious physical damage. ‘Serious physical damage to the property was interpreted as removal of something essential to its support.’ 5 Powell on Real Property, § 660.2 at 96.15 (1977). ‘[Ajnything could be removed unless the removal, in effect, destroyed the structure.’ 2 G. Gilmore, Security Interests in Personal Property, supra, § 30.2 at 804. We conclude, therefore, that the exclusion of
goods and chattels so affixed to real property as to become part thereof and not to be severable or removable without material injury thereto
appearing in N.J.S.A. 54-11A-2 should, looking solely to the language of the statute, be taken to mean only those chattels the removal of which will do irreparable or serious physical injury or damage to the freehold. [Id. 79 N.J. at 377-378, 399 A.2d 649]
The property involved in that case consisted of 170-foot tall cranes weighing one million pounds used to load and unload containerized cargo ships at the docks in Bayonne. The cranes rested on railroad-style rails built into the concrete pier where the ships berthed. The cranes could be rolled onto barges having similar rails and transported to ports as far away as New Orleans and Houston. Applying the test set forth above the Supreme Court held that the cranes were not taxable as real property because they could be removed from the pier without irreparable or serious physical injury or damage to the freehold.
*544 This court recently followed the Bayonne decision in Sta-Seal, Inc. v. Taxation Div. Director, 5 N.J. Tax 272 (Tax Ct.1983), aff’d 6 N.J.Tax 345 (App.Div.1984), certif. den. — N.J.-(1984), and in Lawrence Associates v. Lawrence Tp., 5 N.J.Tax 481, 504-515 (Tax Ct.1983), appeal docketed, A-6045-82T3 (App.Div. Aug. 17, 1983). Sta-Seal involved the taxability of a very large steel structure used for the production of asphalt. This court held that most of the components of the asphalt plant were taxable as business personal property because they could be unbolted and removed from their foundations without significant injury of any kind. However, the concrete piers, slabs and pilings under the plant, which were typically destroyed upon removal, were held to be taxable improvements to real estate. Sta-Seal also held that the plant’s oil and asphalt storage tanks should be taxable as business personal property rather than real property.
Lawrence Associates contained a lengthy discussion of the real property-personal property issue as it applies to specific types of property at a super-regional shopping center. The court in Lawrence Associates expanded upon the Bayonne and Sta-Seal holdings because of the variety of factual patterns prevalent at the shopping mall.
In the present case plaintiff established very clearly that its three above-ground storage tanks of 20,000-gallon capacity could be lifted from their cradles and transported from the site without any injury or damage of any kind. This would be much like the removal of the cranes in the Bayonne case. The cradles supporting the 20,000-gallon tanks could be unbolted from their footings and lifted onto trucks without any damage. This would be analogous to removal of the asphalt plant in the Sta-Seal case. The largest tank could be removed after being disassembled into its original sections, a procedure required by its unwieldly size. Such a procedure would cause no harm to the land beneath the tank because the tank was not attached to or affixed to the land in any manner. Even if there were damage to the tank it would not change the result in this case *545 because, since the tank was never affixed to the land, it never lost its identity as personal property. Thus, any damage to the tank would not be damage to the freehold. Nonetheless, I find that disassembly of the largest tank would cause no serious injury or damage to the tank itself because it could be reassembled after the move had been accomplished. Professional firms engage in just such building and refurbishing of storage tanks.
The more difficult issue in this case involves the five underground storage tanks. These could be lifted from the subject property intact just as could be done with the 20,000-gallon above-ground tanks and no damage at all would occur to the tanks. The only preparatory work that would need to be done before the tanks could be lifted onto a truck would be removal of the soil covering them. The excavation that would result from uncovering one of the 20,000-gallon tanks would be large. Each such tank is 10 feet in diameter and 30 feet long so that the excavation would have to be somewhat longer, wider and deeper than those dimensions. Despite this size, however, such an excavation could not in any reasonable sense be said to constitute “irreparable” physical damage to the land because the hole could easily be refilled. As a result, the land would be virtually the same in all respects as it had been before. The sole question, then, is whether the excavation would constitute “serious” physical damage to the land within the meaning of the phrase “material injury” as used in the Business Personal Property Tax Act, specifically N.J.S.A. 54:11A-2(b)(2).
In the portion of the Bayonne opinion quoted above it is said that “[s]erious physical damage to the property was interpreted as removal of something essential to its support,” citing Powell on Real Property. 79 N.J. at 377, 399 A.2d 649. However, the concept of something being essential to the “support” of a property would not appear to be applicable to land alone. It would not apply to the present situation in which only plaintiffs land would be affected by removal of the underground storage tanks. Yet, in the abstract, one can imagine serious physical damage to land alone, such as might result from strip mining, improper grading, pollution or flooding. Similar damage might *546 also result from the removal of a chattel that had been affixed to the land, such as, conceivably, some type of flood control device.
Some of the factors which might have to be considered in determining whether “serious physical damage” had occurred to unimproved land are: a) any change in the market value of the land as a result of the condition; b) the amount of time and the cost required to repair the condition; and c) the hazard or dislocation caused by the condition.
I find that no “serious physical damage” would be caused to plaintiffs land by an excavation to remove the underground storage tanks and to restore plaintiffs unpaved parking yard to its original state. There is no indication that the value of the land would be affected by such an excavation. The entire process of removing a tank and restoring the ground to its original state would require only two days and would create no serious hazard or dislocation. Finally, the cost to excavate and refill the hole would be relatively insignificant.
I therefore conclude that all nine of plaintiffs fuel oil storage tanks were business personal property for the tax year 1981 and that the tanks should not have been assessed by the taxing district for local property tax purposes. As a consequence, there is no need for the court to consider the proofs adduced at trial regarding valuation of the tanks.
The Clerk of the Tax Court will enter judgment modifying the 1981 assessment on plaintiff’s property to delete the stipulated amount of the assessment attributable to plaintiff’s nine fuel oil storage tanks. The assessment will be as follows:
1981
Land $ 40,700
Improvements 106,500
Total 1147,200

Repealed by L. 1961, c. 120, the Uniform Commercial Code, N.J.S.A. 12A-1 et seq., effective January 1, 1963.