# TAX COURT OF NEW JERSEY



TAX COURT MANAGEMENT OFFICE
(609) 815-2922

P.O. Box 972
TRENTON, NJ 08625-0972

## Corrected Opinion Notice

**February 28, 2025**

**Farhan Ali, Esq.**

**Andrea E. Wyatt, Esq.**

**From:  Lynne E. Allsop**

**Re:  Exelon Generation Co LLC, etc v. Twp. of Lacey**
**Docket number: 002147-2018, et al.**

The attached corrected opinion replaces the version released on 2/25/2025.

The opinion has been corrected as noted below:

Added:  Judges Joseph M. Andresini and Michael Gilmore did not participate in the consideration of publication of this matter.






NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

Corrected February 28, 2025- judges not participating.

-----------------------------------------------x
                               :

EXELON GENERATION CO LLC  :   TAX COURT OF NEW JERSEY
C/O SCHWER,                :   DOCKET NO.:   002147-2018
                               :                    004238-2019

        Plaintiff,     :

        v.               :

TOWNSHIP OF LACEY,      :

        Defendant.   :
-----------------------------------------------x
-----------------------------------------------x
                               :

OYSTER CREEK           :   DOCKET NO.:   007533-2020
ENVIRONMENTAL PROTECT, :              006775-2021
                               :                    005359-2022

        Plaintiff,     :                    003409-2023

        v.               :                    004088-2024

TOWNSHIP OF LACEY,      :

        Defendant.   :
-----------------------------------------------x

               Approved for Publication
               In the New Jersey
               Tax Court Reports

Decided February 25, 2025*

Farhan Ali for plaintiffs (McCarter & English, LLP, attorneys; Frank E. Ferruggia and Farhan Ali, on the Brief).

Andrea E. Wyatt for defendant (Rothstein, Mandell, Strohm, Halm & Cipriani, P.A., attorneys).

*Judges Joseph M. Andresini and Michael Gilmore did not participate in the consideration of publication of this matter.

CIMINO, J.T.C.

I.     INTRODUCTION.

Exelon Generation and Oyster Creek Environmental Protect (Taxpayers) challenge whether storage casks which house highly radioactive spent nuclear fuel are subject to taxation as real property.  Taxpayers must store the spent fuel in the casks to protect the public and the environment from exposure to harmful radiation emitted from the spent fuel. To be considered taxable as real property, the storage casks must be affixed permanently.

Taxpayers assert the spent fuel and storage casks are on-site temporarily until a disposal facility opens to accept the spent fuel from not only this site, but also other sites across the nation.

The Township of Lacey asserts the spent fuel and storage casks are on-site permanently.  By law, there is nowhere to move the spent fuel.  Though there have been plans over the course of decades for various disposal facilities, the spent fuel has continued to accumulate at the site since the 1970s.

The court determines the storage casks are taxable since the Taxpayers cannot transfer the spent fuel to another site.

II.     SPENT NUCLEAR FUEL.

Nuclear power plants generate vast amounts of energy by splitting atoms. Nat'l Academies of Sciences, Engineering and Medicine, Merits and Viability of Different Nuclear Fuel Cycles and Technology Options and the Waste Aspects of

2

Advanced Nuclear Reactors 18 (2023) [hereinafter NAS].  At the core of this process is a nuclear reactor which facilitates a self-perpetuating chain reaction of splitting atoms to generate vast quantities of heat.  NAS 18-19.  The heat boils water which turns turbines connected to electrical generators.  Ibid.  Nuclear power generates about twenty percent of the electrical power in the United States.  NAS 18.

In 1946 and 1954, Congress took steps to regulate and develop the use of nuclear energy.  Atomic Energy Act of 1946, Pub. L. No. 79-585, 60 Stat. 755; Atomic Energy Act of 1954, Pub. L. No. 83-703, 68 Stat. 919.  By 1957, the first commercial nuclear power plant generating electricity came online.  NAS 33.  The Oyster Creek Nuclear Generating Station started generating electricity in 1969.[1] N.J. Env't Fed'n v. NRC, 645 F.3d 220, 223 (3rd Cir. 2011).

In the United States, uranium fuels commercial nuclear plants.  NAS 34. Uranium comes in different varieties.  In nature, over 99% of the mined uranium is U238.  NAS 69.  U238 cannot sustain a chain reaction to generate energy.  NAS 19. However, U235, which makes up a small percentage of mined uranium, can sustain a chain reaction.  NAS 19, 69.  The process of enrichment concentrates the amount of U235.  NAS 19.  The enriched uranium is formed into cylindrical pellets approximately 3/8 inch in diameter and 5/8 inch in length.  Nat'l Research Council, Safety and Security of Commercial Spent Nuclear Fuel 110 (2006) [hereinafter NAS

---

[1] The plant ceased generating power in 2018.

3

II]. New pellets are only slightly radioactive. Phila. Elec. Co., 19 N.R.C. 857, 870 (1984). See NAS 270.

The pellets are placed in fuel rods. NAS 36. The rods are grouped together into fuel assemblies, which are then placed into the core of the nuclear reactor. NAS 36, 37. When the fuel is brought together in the core of the reactor, a self-sustaining nuclear reaction occurs generating energy as heat as well as sub-atomic particles as atoms are split. NAS 70. Notably, U238, which does not sustain the reaction, is converted into plutonium. NAS 69. The reaction also forms other radioactive materials. NAS 20. After a few years, the fuel becomes spent and is replaced. NAS 37. The spent fuel has a high level of relative radiotoxicity. NAS 270.

The spent fuel is removed from the reactor and placed in a large storage pool of water. NAS 37. The pool water cools the fuel while protecting the public and the environment from harmful radiation. NAS II 19. With the storage pool filling up, dry storage casks were placed at the property starting in 1994.

From the storage pool, the fuel is transferred to storage casks. A storage cask is made of two parts, an inner cannister of stainless steel and an outer overpack of mostly concrete. First, the fuel is placed in the inner cannister, which, in turn, is placed in the outer overpack. The Oyster Creek site has 67 storage casks primarily containing spent nuclear fuel.[2] Thirty-four of the casks are rectangular and

---

[2] The casks also contain some other radioactive materials Greater-Than-Class C waste from the operation of the facility. See 10 C.F.R. § 61.55(a)(2)(iv).

approximately measure 15 feet tall, 20 feet in length and 10 feet wide. The other thirty-three casks are cylindrical and approximately measure 20 feet tall with a diameter of 12 feet. The casks weigh 200,000 pounds each when filled. Approximately forty to sixty thousand pounds is the weight of the fuel assemblies. The casks' walls of thick concrete and metal block and absorb the harmful radiation.

The law requires Nuclear Regulatory Commission (NRC) approved storage casks to protect the public and the environment from the harmful radiation emitted by the spent fuel. 10 C.F.R. §§ 72.236 (requirements), 72.214 (approved casks), 72.104 (radiation), 72.106 (radiation). The NRC licenses the on-site facilities for forty years. 10 C.F.R. § 72.42(a). The design life of the casks is sixty years.

When Oyster Creek started generating power in 1969, the plan was to transport the spent nuclear fuel to a reprocessing plant for reprocessing into either uranium- or plutonium-based fuel. Jersey Cent. Power & Light v. Township of Lacey, 772 F.2d 1103, 1105 (3rd Cir. 1985). Reprocessing allows partial reuse of the spent fuel. NAS 38. In fact, some of the spent fuel from Oyster Creek was transported to a facility in New York state for reprocessing. Jersey Cent. Power & Light, 772 F.2d at 1105-06. When the New York facility closed, the fuel was returned to Oyster Creek. Id. at 1107.

In 1974, India detonated a nuclear weapon. NAS 34. The weapon used plutonium reprocessed from a uranium-fueled experimental reactor supplied by Canada and other material supplied by the United States. Edlow Int'l. Co., 5 N.R.C.

5

1358, 1374 (1977). When it comes to building a nuclear weapon, plutonium is produced more quickly and requires one-third of the material. NAS 185. There were fears that the availability of plutonium from reprocessed fuel would lead to the proliferation of nuclear weapons by other nations or terrorists. NAS 34, 45. By 1977, federal government policy ended fuel reprocessing.[3] 13 Weekly Comp. Pres. Doc. 506-07 (Apr. 11, 1977).

The question then became what to do with the spent nuclear fuel from the numerous nuclear plants across the nation. With spent fuel piling up, Congress enacted the Nuclear Waste Policy Act of 1982 to study and designate a disposal site. Pub. L. No. 97-425, 96 Stat. 2201 (codified as amended at 42 U.S.C. §§ 10101 to 10270). Congress mandated an operational site by 1998. 42 U.S.C. § 10222(a)(5)(B).

Congress followed up with the Nuclear Waste Policy Amendments Act of 1987 to essentially designate Yucca Mountain in Nevada as the primary site under consideration. Pub. L. No. 100-203, § 5011(a), 101 Stat. 1330-227, 42 U.S.C. § 10172(a). Nevada officials adamantly opposed development of the site and undertook a series of legal efforts to block it. United States v. Nevada, 123 F. Supp. 2d 1209, 1211 (D. Nev. 2000), vacated sub nom., United States v. Morros, 268 F.3d

---

[3] Economic concerns also influenced the shift away from reprocessing. NAS 34.

695 (9th Cir. 2001); Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251 (D.C. Cir. 2004).

Both technical and legal delays pushed back the deadline for opening Yucca Mountain from 1998 to 2010 to 2020 to 2048. 42 U.S.C. § 10222(a)(5)(B) (1998), 60 Fed. Reg. 21793, 21794 (May 3, 1995) (2010), 74 Fed. Reg. 3012 (Jan. 16, 2009) (2020), 79 Fed. Reg. 56238, 56251 (Sept. 19, 2014) (2048). After twenty-eight years, the Yucca Mountain project was terminated in 2010. 75 Fed. Reg. 41850, 41851 n.8 (July 19, 2010). Congress has not funded the project since 2010. Cong. Rsch. Serv., LSB11199, Consolidated Interim Storage of Spent Nuclear Fuel: Recent Licensing Decisions 2 (July 15, 2024). There are 86,000 metric tons (190 million pounds) of spent fuel material in the United States increasing at the rate of 2,000 metric tons (four million pounds) per year. NAS 21.

With the apparent recognition of the significant delays in developing Yucca Mountain, the nuclear power industry sought an alternative solution. In 1997, a Native American nation and a consortium of nuclear plant operators entered a lease to allow an "interim" storage site on a reservation in Utah. Skull Valley Band of Goshute Indians v. Nielson, 376 F.3d 1223, 1227-28 (10th Cir. 2004) [hereinafter (Skull Valley/Nielson)]. Application was made to the NRC the same year. 71 Fed. Reg. 10068 (Feb. 28, 2006). From 1998 to 2001, Utah enacted a series of laws which effectively banned the facility. Skull Valley/Nielson, 376 F.3d at 1228. After years of litigation and appeals, the Tenth Circuit found Utah's efforts preempted by

7

NRC regulations. Id. at 1254, aff'g, Skull Valley Band of Goshute Indians v. Leavitt, 215 F. Supp. 2d 1232 (D. Utah 2002). See also Bullcreek v. NRC, 359 F.3d 536 (D.C. Cir. 2004) (challenging NRC's authority to license).

Shortly before the NRC licensed the Utah facility in 2006, an amendment to a Congressional spending bill designated 100,000 acres surrounding the facility as wilderness. National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, § 384, 119 Stat. 3136, 3217. See also 71 Fed. Reg. 10068 (NRC license); Skull Valley Band of Goshute Indians v. Davis (Skull Valley/Davis), 728 F. Supp. 2d 1287, 1291 n.5 (D. Utah 2010). The wilderness designation precluded a rail line spur to the facility. Id. at 1291 n.5. Instead, transport would become more difficult with trucks used for the final leg of the journey. Id. at 1291.

Even though the NRC issued a license for the Utah site, the Bureau of Land Management and the Division of Indian Affairs had to approve the land lease. Id. at 1292. Upper-level officials in Washington removed decision-making authority from lower-level officials and denied approval of the lease. Id. at 1293. In 2010, the United States District Court determined that the actions of the Department of Interior and the Bureau of Indian Affairs were arbitrary and capricious. Id. at 1302-04. After fifteen years of litigation and roadblocks, the project was shelved in 2012. 78 Fed. Reg. 56776, 56794 n.8 (Sept. 13, 2013).

More recently, "interim" storage has been proposed for two other sites. Both sites are in the Permian Basin, "one of the country's largest oil basins and a top

8

global oil producer." Texas v. NRC, 78 F.4th 827, 833 (5th Cir. 2023), en banc den., 95 F.4th 935 (5th Cir. 2024). While the sites are only forty miles apart, they are in different states, Texas and New Mexico, and different federal court circuits, the Fifth and the Tenth. See id. at 831 (Andrews County, Texas), Beyond Nuclear, Inc. v. NRC, 113 F.4th 956, 961 (D.C. Cir. 2024) (Lea County, New Mexico).

Initially, Texas and New Mexico expressed support for establishing the facilities. Texas, 78 F.4th at 833. The Texas site applied for a license in 2016, and the New Mexico site applied in 2017. 86 Fed. Reg. 51926, 51927 (Sept. 17, 2021) (Texas); 88 Fed. Reg. 30801, 30802 (May 12, 2023) (New Mexico). Support for both projects evaporated and both Texas and New Mexico challenged the NRC licensing proceedings. Texas, 78 F.4th at 831; New Mexico v. NRC, 59 F.4th 1112, 1115 (10th Cir. 2023). An unlikely alliance of oil and mineral rights landowners and environmental groups opposed the licenses as well. Texas, 78 F.4th at 831, Beyond Nuclear, 113 F.4th at 961. While the litigation was ongoing, the NRC licensed the Texas site in 2021 and the New Mexico site in 2023. 86 Fed. Reg. at 51927 (Texas); 88 Fed. Reg. at 30801, (New Mexico).

The primary issues before the courts were the rights of the states and other entities to challenge the licenses and whether the Nuclear Waste Policy Act of 1982 permitted the licensure of private off-site storage facilities. The Fifth Circuit determined Texas could challenge the license and the NRC lacked the authority to license off-site private storage facilities. Texas, 78 F.4th at 839-40, 844. The Tenth

9

and the D.C. Circuits ruled otherwise. New Mexico, 59 F.4th at 1123-24, Bull Creek, 359 F.3d at 542-43. Beyond Nuclear, 113 F.4th at 964-65. With this split in the Circuits, the Supreme Court granted certiorari. NRC v. Texas, ____U.S.____ 2024 U.S. LEXIS 3064 (Oct. 4, 2024) (No. 23-1300); Interim Storage Partners, LLC v. Texas, ____U.S.____ 2024 U.S. LEXIS 3071 (Oct. 4, 2024) (No. 23-1312) (orders granting certiorari).

There are seventy-five current or former commercial nuclear plants across the nation, all with spent fuel. U.S. Gov't Accountability Off., GAO-21-603, Commercial Spent Nuclear Fuel 6 (Sept. 2021). As part of the Nuclear Waste Policy Act of 1982, the federal government entered into contracts with plant operators to pick-up the spent fuel, take title, and transport it to a permanent repository. 42 U.S.C. § 10222(a)(1). 10 C.F.R. § 961.11 (text of standard contract). For this service, the utilities paid fees into the Nuclear Waste Fund. 42 U.S.C. § 10222(a)(2), (3) (payment), § 10222(c), (d), (e) (establishment, use and administration of fund). When the federal government did not remove the spent fuel, the plant operators sued for breach of contract. Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000). The court determined the plant operators can seek reimbursement of costs associated with storage. Ibid. These costs include property

10

taxes related to storage.[4]  Northstar Vermont Yankee, LLC v. United States, 172 Fed. Cl. 318, 357-58 (2024).

### III. THE TAXATION OF PROPERTY PERMANENTLY AFFIXED TO THE LAND.

This matter comes before the court on cross-motions for partial summary judgment as to whether the storage casks are taxable as real property.  Property that is permanently affixed is considered real property.  The issue turns upon whether the storage casks are permanently affixed.[5]

On summary judgment, the court must assess "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).  As set forth by the Taxpayers, "[t]he [p]arties move before this [c]ourt for partial summary judgment in the hopes of resolving a critical issue . . . ."  Taxpayers contend they are "entitled to [p]artial [s]ummary [j]udgment . . . ."  Conversely, the municipality contends it is "entitled to [partial] summary judgment."  While not a per se rule, "[t]he filing of a cross-motion for summary judgment generally limits the ability of the losing party to argue that an issue raises questions of fact, because the act of filing the cross-motion represents to the court

_____

[4]  The extent of reimbursement to Taxpayers is unclear.

[5]  The fuel itself is not the subject of the motions or this decision.

11

the ripeness of the party's right to prevail as a matter of law." Spring Creek Holding Co. v. Shinnihon U.S.A. Co., 399 N.J. Super. 158, 177 (App. Div. 2008). However, cross-motions do not compel the granting of summary judgment one way or the other. Ibid.

Taxpayers assert the storage casks are nontaxable personal property. With seemingly conflicting statutory provisions as well as case law, analysis of what constitutes real property is a daunting task. The starting point for this analysis is the Uniformity Clause of the New Jersey Constitution that mandates "[a]ll real property assessed and taxed locally . . . shall be assessed according to the same standard of value . . . ." N.J. Const. art. VIII, § 1, ¶ 1(a). The Legislature does not have "unbounded power" to change the definition of real property to avoid the strictures of the Uniformity Clause. Gen. Motors Corp. v. City of Linden, 150 N.J. 522, 533 (1997). To place the Uniformity Clause in proper context, an understanding of how the framers of the 1947 Constitution defined real property is key. Id. at 533-34.

Generally, when personal property is affixed to real property it becomes a fixture and part of the real property. The seminal case of Brearley v. Cox, 24 N.J.L. 287 (Sup. Ct. 1854) explains:

> [T]he true criterion of a fixture is the united application of the following requisites: 1, actual annexation to the realty, or something appurtenant thereto; 2, application to the use or purpose to which that part of the realty with which it is connected is appropriated; 3, the intention . . . to make a permanent accession to the freehold.

[Id. at 289.]

One key point of this ancient rule is the "intention" that property is permanently attached to the land. See id. At the time of adoption of the 1947 Constitution, two doctrines shaped the contours of the intention to permanently attach property. Both doctrines protect a potentially vulnerable party from the overreach of a more sophisticated and wealthy counterparty.

First, the trade fixture doctrine prevents overreaching landlords from keeping fixtures used by tenants to ply their trade. Trade fixtures used in the trade or business of a tenant are considered personal property. The trade fixture doctrine as "commonly accepted" at the time of adoption of the 1947 Constitution was "trade fixtures are removable by a tenant so long as he remains in possession of the leasehold, provided they are capable of removal without material injury to the realty . . . ." Handler v. Horns, 2 N.J. 18, 26 (1949). See also Gen. Motors, 150 N.J. at 534. The rule applies even if the lease does not explicitly preserve the tenant's right to remove the fixture. Handler, 2 N.J. at 26. However, intention is still a factor for consideration. Id. at 24, 25.

Second, the institutional doctrine protects debtors from overreaching creditors. Once personal property becomes an integral part of the property, a creditor cannot repossess the fixture. Smyth Sales Corp. v. Norfolk Bldg. & Loan Ass'n, 116 N.J.L. 293, 300 (E. & A. 1936). "The doctrine has been described as a 'humanitarian gesture' on the part of New Jersey to ameliorate the rigors of harsh

13

economic periods." <u>Gen. Motors</u>, 150 N.J. at 535.  For example, in <u>Smyth</u>, the seller of a heating system installed in a four-family home could not repossess the heater upon nonpayment.  <u>Id.</u> at 294, 300.  The heating system was necessary for the building to function as a dwelling and thus became integrated with the institution. <u>Id.</u> at 297, 300.  Like the trade fixture doctrine, the institutional doctrine also looks to intention of permanent affixation.  <u>Id.</u> at 299-300.  Unsurprisingly, the institutional doctrine reached its apogee during the Great Depression of the nineteen-thirties. <u>Gen. Motors</u>, 150 N.J. at 535.

When it comes to taxation, the difference between real and business personal property was not much of an issue prior to 1968. Municipalities assessed and taxed both at the same rate.  In 1966, the Legislature passed the Business Personal Property Tax Act.  <u>L.</u> 1966, <u>c.</u> 136. (codified as amended at  N.J.S.A. 54:11A-1 to 21) (repealed <u>L.</u> 1993, <u>c.</u> 174, § 1).  Starting in 1968, the Legislature excluded business personal property from local taxation and instead taxed it by the State at a lower rate. N.J.S.A. 54:11A-5 (repealed).  <u>See also</u> <u>L.</u> 1966, <u>c.</u> 136, § 21 (effective 1968). Businesses now sought to have their property taxed as personal property.

With the adoption of the Business Personal Property Tax Act, the question then became how to integrate two seemingly incompatible doctrines, trade fixture and institutional, into the rubric of deciding tax appeals.  The policy concerns undergirding the two doctrines do not apply to tax assessments and appeals.

In 1975, the Appellate Division in Nat'l Lead Co. v. Borough of Sayreville, 132 N.J. Super. 30, 39-40 (App. Div. 1975) relied upon the institutional doctrine in deciding a tax appeal. By 1979, the issue reached the New Jersey Supreme Court in City of Bayonne v. Port Jersey Corp., 79 N.J. 367 (1979). The Court explicitly rejected the institutional doctrine and looked to the statutory text of the Business Personal Property Tax Act. Id. at 377-78. The Act defines personal property as that removable without material injury. Id. at 378; N.J.S.A. 54:11A-2 (repealed). The Court determined that material injury as set forth in the statute "be taken to mean only those chattels the removal of which will do irreparable or serious physical injury or damage to the freehold." Bayonne, 79 N.J. at 378. While not specifically citing its earlier decision of Handler, the Court accepted the "material injury" test which is part and parcel of the trade fixture doctrine. See Handler, 2 N.J. at 24. The issue of intention was not considered.

With the Court's decision in Bayonne, the Tax Court proceeded to apply the material injury standard to a variety of factual contexts. A controversy started to swirl when the court found toilets and free-standing sinks were business personal property. Lawrence Assocs. v. Township of Lawrence, 5 N.J. Tax 481, 512-13 (Tax 1983). However, what truly ignited a controversy was the Tax Court's decision in Stem Brothers, Inc. v. Township of Alexandria, 6 N.J. Tax 537 (Tax 1984). A heating oil distributor had nine fuel oil storage tanks with the largest being a vertical cylindrical tank with the capacity of 150,000 gallons, a diameter of thirty feet, and a

15

height of twenty-eight feet.  Id. at 539.  The other tanks were in the twenty-to-thirty-thousand-gallon range.  Id. at 539-40.  Some were located above-ground while others were located underground.  Ibid.  The court determined serious physical damage would not result from removal of the tanks.  Id. at 546.

Soon thereafter, tank farm owners having millions of gallons of storage capacity filed tax appeals seeking exemption from taxes.  Kenneth R. Kosco, Legislative Survey, The Business Retention Act: An Act concerning the Taxation of Certain Business Property, 18 Seton Hall Legis. J. 873, 881 n.65 (1994).  Municipalities along the Delaware River where a number of these large facilities were located stood to lose between 35% and 55% of their local tax revenues.  Id. at 881 n.67.

Legislation was introduced that simply provided that fuel storage tanks with a capacity of at least 10,000 gallons are considered real property.[6]  S. 1858 (1986).  The Senate amended the bill to add the common law three-part fixtures test to broaden the scope beyond tanks.  S. Cty. & Mun. Gov't Comm. Statement to S. 1858 1-2 (Apr. 7, 1986).  The Assembly then refined the common law test to balance the competing policy concerns of the institutional and the trade fixture doctrines along

---

[6] As adopted, the capacity was set at more than 30,000 gallons.  N.J.S.A. 54:4-1.12. While the spent fuel is solid, the empty volume of the storage casks at issue here is well under 10,000 gallons.

with the need for the municipalities to collect tax revenues.  A. Floor Statement to S. 1858 (June 23, 1986).

The Assembly floor amendment introduced an a and b test.  Ibid.  The a test excepts from real property taxation: property that can be removed or severed (1) without material injury to the real property, (2) without material injury to the personal property, and (3) is not ordinarily intended to be affixed permanently.  L. 1986, c. 117, § 1.  The b test excepts from real property taxation: machinery, apparatus or equipment which is not functionally essential to a structure or constitutes a structure itself.  Ibid.  The text of the a and b tests are separated by an "or." Seemingly, the Legislature wanted to capture items such as large storage tanks which are ordinarily intended to be affixed permanently while at the same time exempt certain equipment used in manufacturing.  However, the b test does not address the issue of intention to permanently affix, a common law requirement predating the adoption of the Uniformity Clause in the 1947 Constitution.  As amended, the law became known as Chapter 117.  L. 1986, c. 117.

In implementing Chapter 117, the Tax Court created a distinction between special-purpose and general-purpose property.  Texas Eastern Transmission Corp. v. Dir., Div. of Tax'n, 11 N.J. Tax 198, 209-11 (Tax 1990) (en banc).  Special-purpose property has unique features restricting its utility to the use for which it was built.  Id. at 209 n.2.  This includes facilities for natural gas transmission, hydroelectric power and specialized manufacturing.  Id. at 210 (natural gas);

17

American Hydro Power Partners v. City of Clifton, 11 N.J. Tax 12, 28 (Tax 1990), aff'd in part, remanded in part, 12 N.J. Tax 264 (App. Div. 1991) (hydroelectric); Badische Corp. v. Town of Kearny, 11 N.J. Tax 385, 390 (Tax 1990) (specialized manufacturing).  Apparatus or equipment functionally essential to the purpose of special-purpose property was part of, and was taxed as, real property.  Texas Eastern, 11 N.J. Tax at 207, 210-11.

While not explicitly mentioned, the distinction utilized by the Tax Court between special-purpose and general-purpose property avoided addressing a lurking constitutional issue.  Chapter 117's b test exempting certain manufacturing equipment does not address the intention of permanent affixation.  At the time of the drafting of the 1947 Constitution, the common law defining the difference between real and personal property, which includes the trade fixtures and institutional doctrines, considered the intention of permanent affixation.

With the Tax Court's special-purpose property decisions, instead of municipalities complaining of lost tax revenues, businesses complained personal property was wrongfully taxed.  Kosco, 18 Seton Hall Legis. J. at 886.  To solve this problem, the Business Retention Act was introduced before the Legislature in 1992.  S. 332 (1992).  "Th[e] legislation [was] intended to replace the classifications established by . . . Tax Court decisions which have greatly narrowed the class of business personal property excluded from local taxation."  Sponsor's Statement to S. 332 4 (Feb. 10, 1992).  The purpose of the bill was "to reject and reverse the

18

classification of property and narrowing of business property exclusions accomplished by a series of recent New Jersey Tax Court decisions . . . ." S. Budget & Appropriations Comm. Statement to S. 332 (Feb. 24, 1992). The Governor believed the "Tax Court upset th[e] arrangement [provided by the 1986 legislation]." Governor's Conditional Veto Statement to S. 332 1 (June 1, 1992). The "bill [wa]s intended to restore clarity to this area of the law by reversing the [Tax Court]" and the Governor was "pleased that the Legislature ha[d] sent [] a bill that [was] narrowly tailored to reverse the [Tax Court]." Id. at 2. The statements specifically named the Tax Court's decisions of Texas Eastern (Governor, Committee and Sponsor), Badische (Committee and Sponsor) and American Hydro (Committee).[7]

---

[7] The Business Retention Act attempted to clarify the b test first adopted in Chapter 117. With the Business Retention Act the pertinent part of the statute now reads as follows:

> Real property taxable under this chapter means all land and improvements thereon and includes personal property affixed to the real property or an appurtenance thereto, unless:
>> a. (1) The personal property so affixed can be removed or severed without material injury to the real property;
>> (2) The personal property so affixed can be removed or severed without material injury to the personal property itself; and
>> (3) The personal property so affixed is not ordinarily intended to be affixed permanently to real property; or
>>
>> b. The personal property so affixed is machinery, apparatus, or equipment used or held for

19

Without the ability to declare property as special-purpose, the Tax Court had to confront whether the b test violated the Uniformity Clause. The court looked back to the common law which required a consideration of objective intent when it comes to permanent affixation, a consideration missing from the b test. Gen. Motors Corp. v. City of Linden, 17 N.J. Tax 1, 7, 14, 16 (Tax 1996). In a comprehensive review of the law, the court determined that "intention is the dominant factor, the safest criterion for determination of the character of a chattel as real property." Id. at 14. The court found that the b test violated the Uniformity Clause. Id. at 16-17.

Writing for the Appellate Division, Judge Pressler reversed "repeat[ing] that the judiciary is not at liberty to override legislative policies with which it disagrees." Gen. Motors Corp. v. City of Linden, 293 N.J. Super. 99, 107 (App. Div. 1996). Judge Pressler noted that the Legislature had to repeatedly act because of "Tax Court recalcitrance." Ibid. Unlike the Tax Court, the Appellate Division "[did] not think it [was] necessary to undertake an extensive analysis of the vagaries of the law of fixtures." Ibid.

---

use in business and is neither a structure nor machinery, apparatus or equipment the primary purpose of which is to enable a structure to support, shelter, contain, enclose or house persons or property.

[N.J.S.A. 54:4-1.]

20

On appeal, the New Jersey Supreme Court undertook an extensive analysis of the vagaries of the law of fixtures as it applies to the Uniformity Clause. Gen. Motors, 150 N.J. at 533-36. While not overturning the Appellate Division, the Supreme Court interpreted the law in such a way as to find the b test constitutional. "Although the syntax of the statute suggests [by the 'or' between the a and b tests] an intent to grant an exemption for real property used in business, we believe the Legislature did not intend that the b test override the a test in circumstances in which affixed personal property would otherwise be taxable as real property under the a test." Id. at 536. "The legislative reasoning contained in the Assembly Committee Statement sustains the conclusion that the b test was not designed to override the a test for the benefit of business interests." Id. at 537.

The Supreme Court then went on to say:

> Although perhaps inartfully done, the legislative drafting suggests that Chapter 117 was intended to insure against the resurrection of the institutional doctrine and to restore intent as an element in determining when affixed personal property becomes real property. We acknowledge that the legislative history is extensive and in places convoluted, but we are confident that the Legislature will clarify its meaning if we have misread it.

[Id. at 538.]

In other words, the Tax Court had a basis to question a literal reading of the b test that did not provide a consideration of intent. However, the Supreme Court read

21

the law to allow the b test to work in conjunction with the a test. Intention of permanent affixation, as one of the factors of the a test, is always a consideration.

The Supreme Court left it to the Tax Court to develop the appropriate application of the a and b tests. The Tax Court established a burden shifting framework in which the a test and its intent requirement was always considered. Gen. Motors Corp. v. City of Linden, 20 N.J. Tax 242, 264-67 (Tax 2002).

IV. THE STORAGE CASKS ARE AFFIXED PERMANENTLY SINCE THE TAXPAYERS CANNOT LEGALLY REMOVE THE NUCLEAR FUEL FROM THE SITE.

As discussed above, regardless of whether the general property a test or the specific business property b test is applied, the three factors of the a test are considered. Gen. Motors, 150 N.J. at 536. Of particular importance in this case is the third factor of the a test which provides, "[t]he personal property so affixed is not ordinarily intended to be affixed permanently to real property . . . ." N.J.S.A. 54:4-1(a)(3) (emphasis added). There are two terms of art embedded within this third factor, namely "permanently" and "ordinarily intended." [8]

Property is considered permanently affixed, and thus taxable, if it remains at the site for the period of its useful life. Gen. Motors, 150 N.J. at 529 (quoting A. Floor Statement to S. 1858); Gen. Motors, 20 N.J. Tax at 283. The custom and usage

---

[8] Due to the massive weight of the casks, the parties do not dispute the casks are affixed. Rather, the issue is permanent affixation.

of the trade is determinative of whether property is ordinarily intended to remain permanently. R.C. Maxwell Co. v. Township of Galloway, 145 N.J. 543, 560 (1996); Gen. Motors, 20 N.J. Tax at 283; N.J.A.C. 18:12-10.1. In other words, it is not the subjective intentions or aspirations of the taxpayer, but the expectations of the marketplace.[9]

Examining the "custom and usage of the trade" serves the important function of avoiding mischief in the application of whether machinery is "ordinary intended" to remain at the site permanently. It is conceivable that for most pieces of industrial machinery a property owner will vigorously argue that it has the intention of eventually removing the machinery from the site. Looking to "custom and usage of the trade" injects a measure of objectiveness into a consideration that would otherwise turn upon the subjective intent of the property owner.

In a highly regulated industry such as commercial nuclear power, all three branches of the federal government largely dictate the custom and usage. Congress sets funding and policy. The Executive implements policy and expends funds. The courts ultimately determine whether any "custom and usage" is in accordance with law. For fifty years, the federal government has mandated a custom and usage of spent nuclear fuel remaining at the nuclear power plants which consumed the fuel.

---

[9] The regulations also look at whether the business property is sold separately or sold with the property. N.J.A.C. 18:12-10.1. Notably, when taxpayer Exelon sold the property to taxpayer Oyster Creek Environmental Project, the spent fuel and storage casks were transferred as well.

There is simply no custom and usage allowing the removal of spent nuclear fuel from a plant site.

Aspirations and dreams of offsite storage are speculative. After twenty-eight years of political wrangling and litigation, the Executive and Congress abandoned the Yucca Mountain project. The proposed Utah site was bogged down for fifteen years until it was shelved. The Texas and New Mexico sites are now bogged down in litigation as well.

The history of spent fuel disposal reveals vigorously contested policy issues litigated by sophisticated parties. The cases cited in this opinion only represent a fraction of the cases on the issue. It seems as if all sides are waging wars of attrition trying to wear down the other side over many years of litigation. How to dispose of spent nuclear fuel has been an issue for fifty years. While the debates and litigation rage on, the fuel continues to pile up at numerous sites across the nation.

Even if the Supreme Court reverses the Fifth Circuit, there is not any hope that the Texas or the New Mexico sites will open anytime soon. In other words, the custom of usage of the industry would not change. There are a number of issues which remain to be resolved and, if the past is any guide, litigated. Two of those issues are transportation and preemption of state statutes.

First and foremost, transportation concerns are likely to be the greatest impediment to the opening of any site. As clearly stated by the Nuclear Regulatory Commission regarding the Texas site:

24

Joint Petitioners are correct that transportation routes will eventually need to be established, and impacts from those routes will need to be analyzed, should ISP's proposed facility be licensed and become operational. Joint Petitioners are also correct that the U.S. Department of Transportation will need to be involved in that analysis.

[Interim Storage Partners LLC, 90 N.R.C. 31, 94 (Atomic Safety & Licensing Bd. 2019), rev'd in part on other grounds, 92 N.R.C. 463, 482-83 (NRC 2020).]

As to the New Mexico site, the NRC indicates:

Spent nuclear fuel transportation route identification requires separate review and approval by the NRC and the Department of Transportation, as well as by applicable States or Tribes. For that separate review process, Holtec will also need to coordinate with local law enforcement and emergency responders. Such coordination is not relevant at this point in the licensing process.

[Holtec Int'l, 89 N.R.C. 353, 446 (Atomic Safety & Licensing Bd. 2019), rev'd in part on other grounds, 91 N.R.C. 167, 209 (NRC 2020), aff'd, Beyond Nuclear, 113 F.4th at 969.]

The transport of spent nuclear fuel is subject to the Hazardous Materials Transportation Act of 1975, as amended by the Hazardous Materials Transportation Uniform Safety Act of 1990. Pub. L. No. 93-633, 88 Stat. 2156; Pub. L. No. 101-615, 104 Stat. 3244. States and tribes have input as to routing of hazardous materials including spent nuclear fuel. 49 U.S.C. § 5112.

A number of states have enacted statutes regulating the transport of spent nuclear fuel. See, e.g., N.J.S.A 26:2D-23.1;[10] N.J.S.A. 26:2D-18; Alaska Stat. § 18.45.027; Cal. Veh. Code § 33002; Colo. Rev Stat. § 42-20-403, 404; Conn. Gen. Stat. § 16a-106; Ga. Code Ann. § 40-1-23; 420 Ill. Comp. Stat. 5/4, 40/34; Ind. Code § 10-14-8-3; Kan. Stat. Ann. § 48-1606; Nev. Rev. Stat. § 459.709; N.H. Rev. Stat. Ann. §§ 107-D:2, 3, 4, 5, 6; N.C. Gen. Stat. § 20-167.1; Ohio Rev. Code. Ann. § 4163.07; Or. Rev. Stat. § 469.530; 35 Pa. Stat. Ann. §§ 7110.601, .602, .603; S.C. Code Ann. § 13-7-140; Tenn. Code Ann. § 65-15-114; Wyo. Stat. Ann §§ 31-18-407, 37-14-103. The statutes run the gamut from outright prohibitions to inspections, escorts, fees and permits.

Certainly, some of the statutes are subject to preemption. See, e.g. Skull Valley/Nielson, 376 F.3d at 1251-53 (pre-emption of effective transport ban). However, the federal government does not exercise complete preemptive powers. 49 U.S.C. § 5125(a). States can apply to the Secretary of Transportation for a waiver of preemption if a state law provides at least as much protection and is not an unreasonable burden on commerce. 49 U.S.C. § 5125(e). On the other hand, a

---

[10] This 1983 statute bans the transport of spent fuel in counties with a population density exceeding 1,000 persons per square mile. The statute has been challenged on preemption grounds. Jersey Cent. Power & Light v. New Jersey, 772 F.2d 35, 39 (3rd Cir. 1985). However, the court never reached the issue since the issue was resolved on the failure of the State to designate routes in accordance with federal regulations. Ibid.

transporter affected by a state's requirement, can apply to the Secretary for a decision as to whether a requirement is preempted. 49 U.S.C. § 5125(d).

With spent fuel coming from upwards of seventy-five plants, any disputes, even with a handful of states, can lead to a multitude of litigation and delays. A seemingly innocuous statute dealing with escorts and permits may have the appearance of validity, yet raise preemption issues upon implementation. The courts will ultimately have to decide the issue. See 49 U.S.C. § 5127.

A second impediment to the opening of any storage site is the Texas and New Mexico laws which limit and regulate the proposed storage facilities. Resolving the status of these laws will delay the opening of any facility. Four days before the NRC issued its license for the Texas facility, the Texas Legislature enacted what is essentially an outright ban on the siting of such facilities in Texas. 2021 Tex. Sess. Law Serv. ch. 2, § 3 (codified as Tx. Health & Safety § 401.072). Likewise, some two months prior to the issuance of the New Mexico license, the New Mexico Legislature set up a task force which would have to evaluate and consent to the storage of any spent fuel "subject to the limitations contained in federal law . . . ." 2022 N.M. Laws ch. 25, § 2 (codified as N.M. Stat. Ann. § 74-4A-7). In addition, New Mexico requires that spent fuel storage cannot take place in New Mexico until the Yucca Mountain site is open. Id. at § 3 (codified as N.M. Stat. Ann. § 74-4A-11.1).

The statutes of both states are reminiscent of the statutes adopted to block the Utah spent fuel facility. It took years of litigation to resolve the preemption issue in Utah.[11] See Skull Valley/Nielson, 376 F.3d at 1228, 1254. It is unlikely Texas or New Mexico will retreat without a court battle, at least a battle that will go up through the respective Circuit Courts.

The two areas outlined above involve the interplay between state and federal law. In some instances, the preemptive effect of federal law may predominate. However, some of the federal laws at issue are not Congressional statutes, but administrative regulations. Generally, valid federal regulations will preempt state law. City of New York v. FCC, 486 U.S. 57, 64 (1988). However, in light of the ascendant major questions doctrine and the abandonment of administrative deference, the impact of federal regulatory preemption is evolving.

The major questions doctrine applies in certain extraordinary cases "[w]here the statute at issue is one that confers authority upon an administrative agency, that inquiry must be 'shaped, at least in some measure, by the nature of the question presented'—whether Congress in fact meant to confer the power the agency has asserted." West Virginia v. EPA, 597 U.S. 697, 721 (2022) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159 (2000)). And, no longer is a federal court required to defer to an interpretation of an administrative agency.

---

[11] In dicta, the Fifth Circuit noted preemption in finding injury-in-fact as standing to challenge the Texas license. Texas, 78 F.4th at 835.

28

Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024) (overruling Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)).  The regulatory scheme of commercial nuclear power in the United States is broad and pervasive.  The recent rulings of the United States Supreme Court provide fertile ground for Texas, New Mexico and other states to sow objections to thwart the opening of the storage facilities.

History amply demonstrates that efforts to relocate the spent fuel have become mired in legal and political wrangling.  It is anyone's guess as to when or if a disposal site will open.  The court cannot base its decision upon speculation.  Unless and until a disposal site is up and running and actually accepting spent fuel, the custom and usage is for the fuel to remain safely stored in the onsite storage casks.

Tax years 2018 through 2024 are under appeal.  Real property is taxed based upon its status and value as of October 1 of the pretax year.  N.J.S.A. 54:4-35.  For example, for the 2018 appeal, the status and value is determined as of October 1, 2017.  As of October 1 of each pretax year under appeal, it would have been pure speculation to assert the spent fuel had somewhere to go.  Since the fuel must remain, the casks must remain as well to protect the public and the environment.

Even if the day ever comes that a facility is actually open and accepting spent fuel, the court will then have to evaluate whether the storage casks are at the end of their useful lives.  As explained earlier, machinery which reaches the end of its useful life while on-site is considered permanent.  Gen. Motors, 150 N.J. at 529 (quoting

A. Floor Statement to S. 1858); Gen. Motors, 20 N.J. Tax at 283. The useful life of the storage casks is sixty years.  This may seem like a long time, but then again, this dispute has already been ongoing for fifty years.

V.    CONCLUSION.

For the foregoing reasons, the court grants the municipality's motion for partial summary judgment and denies the Taxpayers' motion for partial summary judgment.